Kennedy, J.
{¶ 1} In this discretionary appeal from the Tenth District Court of Appeals, we consider whether the General Assembly has the constitutional authority to retroactively reduce the amount of state funding allocated to local school districts and to immunize appellant State Board of Education of Ohio (“the department”) against legal claims by school districts seeking reimbursement for retroactive reductions in school-foundation funding. The department advances the following proposition of law: “The General Assembly has constitutional authority to adjust local school funding retrospectively.” We agree.
{¶ 2} For the reasons that follow, we conclude that the Retroactivity Clause, Article II, Section 28 of the Ohio Constitution, does not protect political subdivisions like appellees Toledo City School District Board of Education, Dayton City School District Board of Education, and Cleveland Metropolitan School District Board of Education (“the boards”) that are created by the state to carry out the state’s governmental functions. Therefore, we hold that the General Assembly has constitutional authority to adjust local school funding retrospectively. We reverse the judgment of the court of appeals and remand this matter to the trial court for further proceedings.
I. Facts and Procedural History

A. Public School District Funding for Fiscal Years 2005 through 2007

{¶ 3} A school district’s revenue is derived primarily from state and local funds, with federal funds playing a lesser role. State funding is determined by and *357 distributed through the School Foundation Program, R.C. Chapter 3317, which is administered by the department. R.C. 3317.01. One component used in the formula for calculating a school district’s funding is the district’s average daily membership (“formula ADM”).
{¶ 4} For fiscal year 2005, a school district’s formula ADM consisted of the total number of students actually receiving the district’s educational services plus the total number of students who were entitled to attend school in the district but who received educational services elsewhere, including at community schools. Former R.C. 3317.03(A)(1) and (2), Am.Sub.H.B. No. 106 (“H.B. 106”), 150 Ohio Laws, Part III, 4254-4255. Each school district certified its formula ADM to the department based on a one-time student count conducted in early October (the “October count”). Id. at 4254.
{¶ 5} Enrollment changes that occurred outside of the October count did not increase or decrease a school district’s funding, with one exception: students who attended community schools but who were not included in their district’s October count were added to the formula ADM. Id. at 4262.
{¶ 6} While community-school students' were included in school districts’ October counts under H.B. 106, 150 Ohio Laws, Part III, the community schools’ funding was not determined based upon those counts. Instead, that funding was based on the number of students in attendance at the community schools, which was submitted monthly to the department in an enrollment report known as the Community School Average Daily Membership (“CSADM”). Cincinnati City School Dist. Bd. of Edn. v. State Bd. of Edn., 176 Ohio App.3d 157, 2008-Ohio-1434, 891 N.E.2d 352, ¶ 7 (1st Dist.). Based upon the CSADM report, the funds attributable to a student enrolled at a community school were deducted from the student’s school district’s school-foundation funds and paid to the community school that reported the student in its CSADM. Former R.C. 3314.08(C), Am.Sub.H.B. No. 95,150 Ohio Laws, Part 1,1117-1118.

B. Department Adjusts Funding for Fiscal Years 2005 through 2007

{¶ 7} During fiscal year 2005, the department noticed that the number of community-school students reported in some districts’ October counts was greater than the number reported in the CSADMs. Believing the CSADMs to be more accurate, the department recalculated those school districts’ school-foundation funding for that fiscal year. The boards respectively allege that the department determined the October counts were too high by the following numbers of students: Toledo, 561 students; Dayton, 688 students; and Cleveland, 575 students.
{¶ 8} This recalculation resulted in the department’s determination that the boards had been overpaid for fiscal year 2005. The department recouped the *358 overpayment by deducting the overpaid amounts from the boards’ school-foundation funding during fiscal years 2005, 2006, and 2007. The boards allege that the department reduced funding during these years by the following amounts: Toledo, $3,576,948; Dayton, $2,548,120; and Cleveland, $1,857,311.

C. Cincinnati Board of Education Litigation

{¶ 9} In 2007, the Cincinnati School District sued the department over its fiscal-year-2005 adjustment of Cincinnati’s school-foundation funding. Cincinnati City School Dist. Bd. of Edn., 176 Ohio App.3d 157, 2008-Ohio-1434, 891 N.E.2d 352. The trial court determined that Ohio law mandated that the formula ADM from the October count be used to calculate school-foundation funding — not the monthly CSADM data from the community schools. Id. at ¶ 2. The First District Court of Appeals affirmed. Id.
{¶ 10} The department appealed to this court, and we accepted review. 119 Ohio St.3d 1443, 2008-Ohio-4487, 893 N.E.2d 515. The action, however, was dismissed before briefing because the parties reached a settlement. 119 Ohio St.3d 1498, 2008-0hio-5500, 895 N.E.2d 562.

D. General Assembly Amends Statute

{¶ 11} During the pendency of the Cincinnati litigation, the General Assembly amended R.C. 3317.03 to authorize the department to adjust the formula ADM if an error was discovered. Former R.C. 3317.03(K), 2007 Am.Sub.H.B. No. 119. Additionally, in the 2009 biennial budget bill, the General Assembly immunized the department from liability for any legal claim for reimbursement brought by a school district for the reduction of school-foundation funding for fiscal years 2005, 2006, or 2007 (“budget provision”). See 2009 Am.Sub.H.B. No. 1, Section 265.60.70.

E. Toledo, Cleveland, and Dayton Litigation

{¶ 12} In 2011, four years after the last reduction in funding resulting from the 2005 adjustment of their formula ADMs, the boards filed complaints seeking an order that the department had to pay their respective funds for fiscal years 2005 through 2007 using only the formula ADMs from the October counts and not from the CSADMs. The boards also sought equitable restitution for funds they claimed that the department had wrongfully withheld. Parents of some children in the school districts joined the suits but did not allege separate claims. The three cases were transferred to the Franklin County Court of Common Pleas and consolidated.
• {¶ 13} The department moved for judgment on the pleadings, arguing in part that the budget provision barred the boards’ claims and insulated the department *359 from liability. The trial court held that the budget provision’s elimination of potential state liability was unconstitutionally retroactive. The Tenth District Court of Appeals affirmed. 2014-Ohio-3741, 18 N.E.3d 505. It held that the budget provision was unconstitutionally retroactive because it impaired the boards’ “substantive right to School Foundation funds that accrued under the statutory law in place for FY 2005 through FY 2007.” Id. at ¶ 42.
II. Law and Analysis

A. Positions of the Parties

{¶ 14} The department argues that the Retroactivity Clause protects private parties, not arms of the state, and that therefore, the boards’ claims that the budget provisions are unconstitutionally retroactive fails. The department sets forth numerous bases for its position. First, when the 1851 Constitution was adopted, the settled meaning of “retroactive laws” did not reach laws affecting government entities, and debate during the 1850-1851 constitutional convention reveals the intention to incorporate the settled meaning into the Constitution. Second, the Ohio Constitution’s structure reinforces the conclusion that the phrase “retroactive laws” does not apply to laws affecting the state’s political arms. Third, decisions of this court after the Constitution’s ratification hold that the Retroactivity Clause does not prohibit retroactive laws negatively affecting state subdivisions. Lastly, the department argues that the Tenth District relied upon cases that did not squarely address this issue.
{¶ 15} In response, the boards argue that the Retroactivity Clause is absolute in its prohibition, and therefore, there is no reason to engage in historical analysis. Nevertheless, if historical context is considered, they argue, the intention of the framers was for the clause to protect all parties, not just private ones. The boards posit that the framers’ discussion regarding the prohibition of retroactive laws was an all-or-nothing proposition. They also contend that this court has afforded political subdivisions the protections of the Retroactivity Clause.

B. Constitutionality; General Considerations

{¶ 16} Generally speaking, in construing the Constitution, we apply the same rules of construction that we apply in construing statutes. Miami Cty. v. Dayton, 92 Ohio St. 215, 223, 110 N.E. 726 (1915). Therefore, the intent of the framers is controlling. State v. Jackson, 102 Ohio St.3d 380, 2004-Ohio-3206, 811 N.E.2d 68, ¶ 14. To determine intent, we must begin by looking at the language of the provision itself. State ex rel. Maurer v. Sheward, 71 Ohio St.3d 513, 520, 644 N.E.2d 369 (1994). “Where the meaning of a provision is clear on its face, we will not look beyond the provision in an attempt to divine what the drafters intended it to mean.” Id. at 520-521. Words used in the Constitution that are *360 not defined therein must be given their usual, normal, or customary meaning. State ex rel. Herman v. Klopfleisch, 72 Ohio St.3d 581, 584, 651 N.E.2d 995 (1995); see also R.C. 1.42. If the meaning of a provision cannot be ascertained by its plain language, a court may look to the purpose of the provision to determine its meaning. See Castleberry v. Evatt, 147 Ohio St. 30, 67 N.E.2d 861 (1946), paragraph one of the syllabus.

C. Retroactivity Clause

{¶ 17} The Retroactivity Clause of the Ohio Constitution, Article II, Section 28, remains unchanged from its adoption in 1851:
The general assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts; but may, by general laws, authorize courts to carry into effect, upon such terms as shall be just and equitable, the manifest intention of parties, and officers, by curing omissions, defects, and errors, in instruments and proceedings, arising out of their want of conformity with the laws of this state.
{¶ 18} The literal meaning of the clause is that the legislature is absolutely prohibited from passing any law that is “ ‘made to affect acts or facts occurring, or rights accruing, before it come into force.’ ” Bielat v. Bielat, 87 Ohio St.3d 350, 353, 721 N.E.2d 28 (2000), quoting Black’s Law Dictionary 1317 (6th Ed.1990). This court, however, has recognized that “retroactivity itself is not always forbidden by Ohio law.” Id. Instead, “there is a crucial distinction between statutes that merely apply retroactively * * * and those that do so in a manner that offends our Constitution.” Id., citing Rairden v. Holden, 15 Ohio St. 207, 210-211 (1864), and State v. Cook, 83 Ohio St.3d 404, 410, 700 N.E.2d 570 (1998). Accordingly, we must look to the purpose of the Retroactivity Clause to determine whether the statute at issue offends it.

D. Meaning of Retroactivity in 1851

{¶ 19} We begin by examining whether “retroactive laws” was a term of art with an established meaning at the time of the ratification of the 1851 Constitution. Compare Collins v. Youngblood, 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (“ex post facto law” was a term of art with an established meaning at the time of the framing of the United States Constitution). If so, the meaning may have been incorporated from common law, see Richardson v. Doe, 176 Ohio St. 370, 372-373, 199 N.E.2d 878 (1964) (discussing the origin of the term “malpractice” and noting that “where a statute uses a word which has a definite meaning at common law, it will be presumed to be used in that sense”), *361 or from other state constitutions or laws at the time, see State ex rel. Durbin v. Smith, 102 Ohio St. 591, 599, 133 N.E. 457 (1921) (noting that the debates at the Ohio constitutional convention show that Ohio’s referendum provision was copied from the Oregon Constitution and that a decision of the Oregon Supreme Court regarding that provision was considered at the convention).
1. Other States’ Constitutions
{¶20} Prior to 1851, New Hampshire, Missouri, Tennessee, and Texas had adopted constitutional provisions prohibiting retroactive laws. See New Hampshire Constitution, Part 1, Article 23 (1784); Missouri Constitution, Article XIII, Section 17 (1820); Tennessee Constitution, Article 1, Section 20 (1834); Texas Constitution, Article 1, Section 14 (1845). By 1851, the supreme courts of both New Hampshire and Texas had had the opportunity to construe the meaning of their respective provisions. See Merrill v. Sherburne, 1 N.H. 199, 212-213 (1818); DeCordova v. Galveston, 4 Tex. 470, 479 (1849). The Merrill court, in concluding that an act was unconstitutionally retroactive, stressed that only those retrospective acts that “operate on the interests of individuals or of private corporations” violate the constitution, explaining that “all public[ ] officers impliedly consent to alterations of the institutions in which they officiate, provided the public[ ] deem it expedient to introduce a change.” (Emphasis sic.) Merrill at 213, 217. The DeCordova court noted Merrill’s, statement about individuals and private corporations and found that Merrill “illustrate[d] the intention of the [Texas] convention in imposing the restriction. ” DeCordova at k79.
2. Established Common-Law Principles
{¶ 21} At the time of the Ohio constitutional convention, it was an established principle that an act was not unconstitutionally retroactive “unless [it] impair[ed] rights which are vested: because most civil rights are derived from public[ ] laws; and if, before the rights become vested in particular individuals, the convenience of the state produces amendments or repeals of those law, those individuals have no cause of complaint.” (Emphasis sic.) Merrill at 213-214; see also DeCordova at 470, 479-480 (law was unconstitutionally retrospective if it “destroyed] or impair[ed] vested rights or rights to do certain actions or possess certain things”); Proprietors of Kennebec Purchase v. Laboree, 2 Me. 275, 295 (1823) (finding a law unconstitutionally retroactive “because such operation would impair and destroy vested rights ” [emphasis sic]).
{¶ 22} By 1851, it was understood that both individuals and private corporations could acquire vested rights. The Supreme Court of the United States had held that the charter founding a college that was a private corporation was a contract between the government and the corporation and that the legislature could not repeal, impair, or alter the rights and privileges conferred by the *362 charter. Trustees of Dartmouth College v. Woodward, 17 U.S. 518, 643-644, 650-654, 4 L.Ed. 629 (1819).
{¶ 23} This court had, however, concluded that public corporations did not enjoy vested rights:
[A] public corporation, created for the purposes of government, can not be considered as a contract. * * *.“In respect to public corporations, which exist only for public purposes, as counties, cities, and towns, the legislature, under proper limitations, have a right to change, modify, enlarge, or restrain them, securing, however, the property, for the uses of those for whom it was purchased.”
Marietta v. Fearing, 4 Ohio 427, 432 (1831), quoting 2 Kent’s Commentaries on American Law 245 (1st Ed.1827).
{¶ 24} The supreme courts of Louisiana and Indiana had espoused the same principle. The Louisiana court had stated:
The questions as to the violation of contracts or vested rights under the Constitution of the United States, or of the State, does not arise. Those questions grow entirely out of the violation of contracts with, or the vested rights of individuals or private corporations established for individual profit.
The corporation of a town is established for public purposes alone, and to administer a part of the sovereign power of the State over a small portion of its territory. It is created by the Legislature and is entirely subject to Legislative will.
Police Jury of Bossier v. Corp. of Shreveport, 5 La.Ann. 661, 665 (1850). The Indiana court had stated:
The special powers conferred upon [public or municipal corporations] are not vested rights as against the State, but being wholly political exist only during the will of the general Legislature * * *. Such powers may at any time be repealed or abrogated by the Legislature, either by a general law operating upon the whole State, or by a special act altering the powers of the corporation.
*363 Sloan v. State, 8 Blackf. 361, 364 (Ind.1847).
{¶ 25} Around this time, the Supreme Court of the United States also recognized that public corporations did not enjoy the same protections as individuals and private corporations:
[the legislature] had unquestionably the power to change its policy, and allow the company to pursue a different course, and to release it from its obligations both as to the direction of the road and the payment of the money. For, in doing this, it was dealing altogether with matters of public concern, and interfered with no private right; for neither the commissioners, nor the county, nor any one of its citizens, had acquired any separate or private interests which could be maintained in a court of justice.
Maryland v. Baltimore & Ohio RR. Co., 44 U.S. 534, 549-550, 11 L.Ed. 714 (1845) (upholding a state legislature’s ability to revoke an act providing for a company to forfeit funds to a county if a road was not built, because the forfeiture was for public, not private, purposes and was to be made to a public body).
{¶ 26} Accordingly, at the time of the 1850-1851 constitutional convention, two key principles were established. First, unconstitutional retroactive acts were those that operated on the vested rights of individuals or of private corporations. Second, political subdivisions as creatures of the state did not have vested rights.

E. Debates of the 1850-1851 Constitutional Convention of Ohio

{¶27} We have previously noted the function of the proceedings of the constitutional convention in revealing the intent of a provision in the Constitution. “ ‘[D]ebates of the convention * * * may fortify [the court] in following the natural import of [the provision’s] language, and legitimately aid in removing doubts.’ ” Steele, Hopkins & Meredith Co. v. Miller, 92 Ohio St. 115, 122, 110 N.E. 648 (1915), quoting Cass v. Dillon, 2 Ohio St. 607, 621 (1853). An examination of the debates from the 1850-1851 constitutional convention confirms that the intent of the framers was to incorporate the aforementioned principles regarding “retroactive laws” into Article II, Section 28.
{¶ 28} The debate regarding the retroactivity provision reveals that delegates to the convention saw a need to provide private individuals with certainty in the law. One delegate expressed his approval of the provision as it “settles forever and conclusively one or two questions of controversy, which exist in this State and leave the law in a most distressing uncertainty. It matters not whether it is right or wrong — it has left the law in uncertainty and the rights of individuals dependent upon the opinions of the Supreme Court.” 1 Report of the Debates *364 and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio, 1850-1851 (“Debates”) 268. The delegate also expressed his belief “in the principle that men’s rights are to be settled by the law in force at the time they accrued.” Id. at 270.
{¶ 29} Similarly, another delegate expressed that
it is indispensably necessary that the exercise of [the] power [to prescribe the rules of civil action] should only look ahead, that it should be only prospective in its operation, for the idea of making a rule to punish the action of men, or to affect their rights and interests, already past and accrued, would be as bad as the practice of the Roman despot, when he wrote his laws in small characters, and stuck them up so high that the people could not read them.
2 Debates at 591.
{¶ 30} The debate concerning the legislature’s ability to enact “curative” laws was also centered on individuals. One delegate “intended merely to call attention to the difficulty that might arise out of the adoption of this section; and which might go far to affect the rights of a citizen.” 1 Debates at 265. Other delegates stressed the desire to protect the legislature’s ability to pass curative laws as “they are laws of peace and affording security to the rights of the citizen,” id. at 274, and they “may be used for the protection of private rights — for the purpose of curing those evils which sometimes arise in society, and which, if not cured, would work immense mischief and wrong,” 2 Debates at 240.
{¶ 31} The delegation was also cognizant of the New Hampshire Constitution’s retroactivity provision and its interpretation by the Merrill court. A delegate in favor of adopting the retroactivity provision stated:
the New Hampshire constitution contains a prohibition against retrospective, or, as called here, retro-active laws[.] The[s]e two are equivalent terms. It * * * precludes [the legislature] from in terfering [sic] with any right already vested; from making any law which, instead of looking to the future, interferes with the rights of persons and property which are already vested. If gentlemen will look [at Merrill ] they will find an opinion * * * which * * * discusses - the whole subject of retro-active legislation, and the effect of this term retrospective.
1 Debates at 269.
{¶ 32} There was also an acknowledgment of the distinction that had developed in case law between private and public corporations. Referencing Trustees of *365 Dartmouth College, 17 U.S. 518, 4 L.Ed. 629, and this court’s decision in Fearing, 4 Ohio 427, one- delegate stated that unlike private corporations, municipal corporations “were always liable to repeal.” 2 Debates at 270.
{¶ 33} Accordingly, when Article II, Section 28 was adopted in 1851, the delegates knew that similar provisions in other state constitutions had been interpreted to “operate on the interests of individuals or of private corporations.” Merrill, 1 N.H. at 212-213. They also comprehended that a legislative enactment had to impair the vested rights of individuals or private corporations to be unconstitutionally retroactive.

F. Decisions after Adoption of Retroactivity Provision

{¶ 34} This court’s precedent in the years following the enactment of Article II, Section 28 provides further support for finding that the Retroactivity Clause applies to private citizens and corporations but not to political subdivisions. We have rejected retroactivity challenges to legislation that sought to impose a new duty and/or create a new obligation upon political subdivisions, consistently finding that the state is able to injuriously affect its own rights.
{¶ 35} A retroactivity challenge was asserted to legislation that imposed a new obligation upon cities to pay bounties to Civil War veterans who had reenlisted and to whom, at the time of reenlistment, the city had not made any promise or pledge to pay a bounty. State ex rel. Bates v. Richland Twp. Trustees, 20 Ohio St. 362 (1870). We found that the legislature had not “transcended their constitutional authority” because “counties, townships, and cities are public agencies in the system of the State government; and, in the class of laws now under consideration, they are employed by the legislature as mere instrumentalities to raise a tax for a public object, and to effect its equitable distribution among those for whom it was intended.” Id. at 371.
{¶ 36} In examining the effect that a legislative amendment had on the payment of unused vacation time upon a state employee’s retirement, we noted that a “statute which impairs only the rights of the state may constitutionally be given retroactive effect.” State ex rel. Sweeney v. Donahue, 12 Ohio St.2d 84, 87, 232 N.E.2d 398 (1967), citing State ex rel. Dept. of Mental Hygiene & Correction v. Eichenberg, 2 Ohio App.2d 274, 207 N.E.2d 790 (9th Dist.1965) (“This law cannot be deemed to be a retroactive law for it does not injuriously affect a citizen or interfere with a citizen’s vested right”). Similarly, a challenge to a statute that retroactively relieved a public official and his sureties of liability for lost or stolen funds was without merit because “the legislature undoubtedly has authority to release obligations which could only be * * * prosecuted [in the name of the state].” Bd. of Edn. v. McLandsborough, 36 Ohio St. 227, 232 (1880).
*366 {¶ 37} This court also examined a retroactivity challenge to legislation that validated previously ratified municipal ordinances authorizing contractors to lay pipes to supply the public with steam heat and power. The legislation was found to be valid because Article II, Section 28 “ ‘does not apply to legislation recognizing or affirming the binding obligation of the state, or any of its subordinate agencies, with respect to past transactions,’ ” but instead “ ‘is designed to prevent retrospective legislation injuriously affecting individuals, and thus protect vested rights from invasion.’ ” Kumler v. Silsbee, 38 Ohio St. 445 (1882), quoting New Orleans v. Clark, 95 U.S. 644, 655, 24 L.Ed. 521 (1877).
{¶ 38} In contrast to the foregoing, there is a body of cases that appears to support a finding that political subdivisions are entitled to the protection granted under Article II, Section 28. This court has found legislative acts that have imposed new obligations on state subdivisions to be unconstitutionally retroactive. See Hamilton Cty. Commrs. v. Rosche, 50 Ohio St. 103, 33 N.E. 408 (1893), paragraph one of the syllabus (law requiring county to refund taxes that had already been paid); State ex rel. Crotty v. Zangerle, 133 Ohio St. 532, 534-535, 14 N.E.2d 932 (1938) (law requiring county to refund tax penalties that had already been paid); Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision, 91 Ohio St.3d 308, 316-317, 744 N.E.2d 751 (2001) (law allowing parties to correct errors in valuation complaints, which would impose new burdens on county officials to defend previously dismissed claims).
{¶ 39} Upon close examination, however, these cases are all silent on the threshold issue; that is, whether political subdivisions have rights under Article II, Section 28. Instead, in each case, there is an assumption that the protection afforded by the Retroactivity Clause is available to political subdivisions and the analysis is solely devoted to whether the law in question is retroactive. Accordingly, these cases lack precedential value and we are not bound by them. See State ex rel. United Auto., Aerospace & Agricultural Implement Workers of Am. v. Bur. of Workers’ Comp., 108 Ohio St.3d 432, 2006-Ohio-1327, 844 N.E.2d 335, ¶ 46 (“ ‘ “when questions of jurisdiction have been passed on in prior decisions sub silentio, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us” ’ ”), quoting Grendell v. Ohio Supreme Court, 252 F.3d 828, 837 (6th Cir.2001), quoting Hagans v. Lavine, 415 U.S. 528, 535, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), fn. 5.
{¶ 40} Our decision in Avon Lake City School Dist. v. Limbach, 35 Ohio St.3d 118, 518 N.E.2d 1190 (1988), provides strong support for determining that political subdivisions do not have rights under Article II, Section 28. In that case, two school districts challenged the tax commissioner’s valuation of personal property of public utility companies. The Board of Tax Appeals dismissed the appeals, ruling that the school districts did not have standing to file an appeal. *367 We were presented with the issue whether the dismissals by the Board of Tax Appeals deprived the school districts of their right to due process of law. We reviewed cases that “conclude[d] that a political subdivision may not invoke the protection provided by the Constitution against its own state and is prevented from attacking the constitutionality of state legislation on the grounds that its own rights had been impaired.” Id. at 121-122. “[P]ersuaded that a school district is a political subdivision created by the General Assembly and that it may not assert any constitutional protections regarding due course of law or due process of law against the state, its creator,” we concluded that the school districts could not “assert these protections against the state by asking [us] to declare the statute unconstitutional for these reasons.” Id. at 122.
{¶ 41} Accordingly, we have recognized that political subdivisions are not entitled to all protections afforded by the Constitution. Additionally, our precedent in the years following the enactment of Article II, Section 28 provides strong support for concluding that the Retroactivity Clause does not apply to political subdivisions.

G. Decisions by Sister Supreme Courts

{¶ 42} A number of our sister supreme courts have examined whether the prohibition on retroactive laws extends to political subdivisions; their opinions provide additional guidance. The supreme courts of New Hampshire and Texas have both reaffirmed their previous holdings. See Nottingham v. Harvey, 120 N.H. 889, 898, 424 A.2d 1125 (1980) (a town “is a mere political subdivision of the State over which the legislature may exercise complete control”); Deacon v. Euless, 405 S.W.2d 59, 62 (Tex.1966) (“Municipal Corporations do not acquire vested rights against the State”). The supreme courts of Massachusetts, Idaho, and Tennessee have concluded similarly. See Greenaway’s Case, 319 Mass. 121, 123, 65 N.E.2d 16 (1946) (no constitutional challenge can succeed when a state enacts retroactive legislation impairing its own rights); Garden City v. Boise, 104 Idaho 512, 515, 660 P.2d 1355 (1983) (legislature has absolute power to change, modify, or destroy at its discretion the powers granted to a municipal corporation); State ex rel. Meyer v. Cobb, 467 S.W.2d 854, 856 (Mo.1971) (retroactivity provision is for the protection of the citizen and not the state, and the state may retroactively impose new liabilities on itself or its governmental subdivisions). The United State Supreme Court has also reached the same conclusion with respect to Louisiana’s constitution. New Orleans v. Clark, 95 U.S. at 655, 24 L.Ed. 521 (prohibition against retroactivity is to prevent injuriously affecting individuals; it does not apply to recognizing or affirming a binding obligation of the state or its subordinate agencies with respect to past transactions).
*368 {¶ 43} A Missouri case is particularly instructive due to its similarities to the case now before us. See Savannah R-III School Dist. v. Pub. School Retirement Sys. of Missouri, 950 S.W.2d 854 (Mo.1997). In that case, the Missouri Public Employees Retirement System had notified school districts that the value of health-insurance premiums provided to teachers was to be included as salary for the purpose of calculating the teachers’ contribution amount. Years later, some districts filed a class-action lawsuit seeking a refund of the overpayment, as the legislative definition of salary did not include health-insurance premiums. While the action was pending, the Missouri legislature amended the statute so that the definition of salary included health-insurance premiums. The legislation also stated that any contributions made before the effective date of the amendment were deemed to have been in compliance with the statute.
{¶ 44} The school districts argued that the amendment was unconstitutionally retroactive. The court rejected the challenge, noting that the prohibition’s purpose was to protect citizens, not the state. The court’s statement regarding school districts is particularly germane:
“School districts are bodies corporate, instrumentalities of the state established by statute to facilitate effectual discharge of the General Assembly’s constitutional mandate to establish and maintain free public schools * * State ex rel. Independence Sch. Dist. v. Jones, 653 S.W.2d 178, 185 (Mo. banc 1983) (quotation omitted). As “creatures of the legislature,” the rights and responsibilities of school districts are created and governed by the legislature. Id. Hence, the legislature may waive or impair the vested rights of school districts without violating the retrospective law prohibition. Dye v. School Dist. No. 32, 355 Mo. 231, 195 S.W.2d 874, 879 (banc 1946).
Savannah R-III School Dist., 950 S.W.2d at 858.
III. Conclusion
{¶ 45} The avenues examined all converge at the conclusion that political subdivisions are not entitled to the protection of Article II, Section 28. Prior to the 1850-1851 constitutional convention, the law that had developed in the country was that retroactivity provisions protected the vested rights of individuals and private corporations and that public corporations did not have vested rights. The debates from the convention reveal that the delegates understood this to be the scope of the protection provided by the retroactivity provision. Our early cases reflect this understanding. Finally, the weight of the authority from our sister supreme courts points toward the same conclusion.
*369 {¶ 46} Accordingly, we hold that the Retroactivity Clause, Article II, Section 28 of the Ohio Constitution, does not protect political subdivisions, like school districts, that are created by the state to carry out its governmental functions. Therefore, the legislature was able to authorize the department to adjust local school funding calculations and to retroactively immunize the department from liability for any legal claim of reimbursement by a school district for a reduction of school-foundation funding, without violating the Retroactivity Clause. We reverse the judgment of the Tenth District and remand the matter to the trial court for consideration of the issues not addressed in its decision on the department’s motion for judgment on the pleadings.
Judgment reversed and cause remanded.
O’Connor, C.J., and O’Donnell and French, JJ., concur.
Pfeifer, J., concurs in judgment only, with an opinion.
O’Neill, J., dissents, with an opinion joined by Lanzinger, J.