[Cite as *Cleveland Elec. Illum. Co. v. Cleveland*, 2020-Ohio-33.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

THE CLEVELAND ELECTRIC     :
ILLUMINATING CO.,

    :

    Plaintiff/Counterclaim
    Defendant-Appellant,     :

        No. 108560

    v.     :

CITY OF CLEVELAND, ET AL.,     :

    Defendants/Counterclaim   :
    Plaintiffs-Appellees.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** January 9, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-897478

---

## *Appearances:*

Benesch, Friedlander, Coplan & Aronoff L.L.P., Gregory J. Phillips, Michael J. Montgomery, Michael D. Meuti, James E. von der Heydt, and James J. Walsh, Jr., *for appellant.*

Carpenter Lipps & Leland L.L.P., Kimberly W. Bojko, Angela Paul Whitfield, and Stephen E. Dutton, *for appellees city of Cleveland and Cleveland Public Power.*

Kevin M. Butler, *for appellee city of Brooklyn.*

Bricker & Eckler L.L.P., Drew H. Campbell, and Elyse Akhbari, *for appellee Cuyahoga County.*

EILEEN A. GALLAGHER, J.:

{¶ 1} This case involves a dispute as to whether defendants/counterclaim-plaintiffs-appellees the city of Cleveland and Cleveland Public Power ("CPP") (collectively, "the city") violated Sections 4 and 6, Article XVIII, of the Ohio Constitution by purchasing electricity and reselling it to customers outside Cleveland's municipal boundaries. Plaintiff/counterclaim defendant-appellant The Cleveland Electric Illuminating Co. ("CEI") appeals from the trial court's decision (1) granting the city's motion for summary judgment on CEI's claims for declaratory judgment, tortious interference with contract/business relations and unfair competition and (2) denying its own motion for summary judgment on its claim for declaratory judgment. CEI contends that the Ohio Constitution prohibits a municipality from purchasing more electricity than is needed by its inhabitants and reselling the excess electricity to customers outside the municipality. The city contends that the only constitutional restriction on its ability to sell electricity outside its municipal boundaries is a "fifty percent limitation," i.e., that the city may not sell more than "fifty per cent of the total service or product supplied by such utility within the municipality" to customers outside the municipality (the "50 percent limitation"), and that the trial court properly granted its motion for summary judgment and denied CEI's motion for summary judgment because there is no genuine issue of fact that the city's extraterritorial sales of electricity did not exceed the fifty percent limitation. For the reasons that follow, we reverse the trial

court's decision granting summary judgment in favor of the city on CEI's counterclaims and remand for further proceedings.

**Factual and Procedural Background**

### The City's Purchase and Supply of Electricity to Customers

{¶ 2} CPP was established in 1906. CPP, a division of Cleveland's Department of Public Utilities, is a municipally owned electric company that supplies electric energy to its customers, most of whom are located in Cleveland. During the early years of its operation, CPP sold electricity to customers that it had generated from its own power plants. In 1977, CPP shut down most of its generating units and ceased generating any significant amount of electricity.

{¶ 3} CPP's primary competitor is CEI, a public utility regulated by the Ohio Public Utilities Commission ("PUCO") that distributes electric power to customers in northeast Ohio pursuant to the Certified Territory Act. As a regulated public utility, CEI has the exclusive right to provide electric service to customers within its assigned territory, subject to municipalities' "home rule authority" under Sections 4 and 6 of Article XVIII of the Ohio Constitution ("Sections 4 and 6"). *See* R.C. 4933.83; *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 76 Ohio St.3d 521, 521, 525-526, 668 N.E.2d 889 (1996), fn. 1; *Toledo Edison Co. v. Bryan*, 90 Ohio St.3d 288, 288, 737 N.E.2d 529 (2000). Sections 4 and 6 grant municipalities the right to produce or purchase electricity for their inhabitants and the right to sell limited amounts of surplus electricity to entities outside the geographic boundaries of the municipality. *Id.*

**{¶ 4}** Today, most electricity is generated by large, privately owned facilities and then transmitted to resellers, e.g., electricity utility companies, which pull electricity from the national transmission grid and supply that electricity to end users. Regional transmission organizations ("RTOs") provide access to the transmission grid and enable participants to buy and sell electricity through these wholesale markets, matching demand for electricity with offers to provide it. PJM, the RTO in which CPP's and CEI's service territories are located, manages the transmission grid in 13 states and the District of Columbia. The price of electricity can be negotiated and predetermined by contract or determined by auction in the wholesale energy markets.

**{¶ 5}** CPP employs a "portfolio approach" to procure the electricity it needs to service its customers. According to Christopher Williams, CPP's manager for energy markets, CPP forecasts its electricity needs on both a monthly and annual basis, i.e., "we typically go about a year in advance in terms of an in-depth kind of look at where we expect our load to be," "analyze and look at our monthly peaks and then we make purchases according to meeting our needs." CPP's current "power supply portfolio" consists of: (1) contracts for energy purchases from certain renewable energy generation projects, including the Brooklyn solar project and a wind project,[1] (2) long-term contractual relationships with several generating

---

[1] In 2017, Cuyahoga County and Brooklyn partnered with IGS Solar, L.L.C. and Enerlogics Solar, L.L.C. to build a solar-powered electric generation facility on the site of a former landfill in Brooklyn to power county-owned office buildings in Cleveland (the "Brooklyn solar project"). In December 2017, Cuyahoga County and the city entered into various agreements pursuant to which the city agreed to purchase all of the power

facilities through its membership in American Municipal Power, Inc. ("AMP"), a consortium of municipalities that owns and operates power plants, (3) contracts of "various quantities and terms from a variety of wholesale market-based suppliers," including spot, medium and long-term market purchases from the PJM wholesale markets and (4) the energy generated by several combustion turbine generating units and diesel generators.

### CPP Provides Electricity to Customers in Brooklyn

{¶ 6} In April 2017, the Brooklyn City Council passed an ordinance consenting to CPP's construction of distribution facilities in Brooklyn, Ohio and granting CPP a "nonexclusive franchise" to provide electricity service to customers in Brooklyn. In March 2018, Cleveland entered into a "customer agreement" with Brooklyn to provide electricity to seven of its municipal buildings located in Brooklyn with an anticipated "maximum demand or capacity of 1,000 kWd." The agreement was for an initial term of ten years "from the date permanent electric

---

generated by the Brooklyn solar project and to supply electricity to various county-owned office buildings located in Cleveland. As specified in these agreements, the power the city supplied to the county-owned buildings in Cleveland was to come from the output of the Brooklyn solar project, a portion of the power output from a separate offshore wind-powered turbine generator project (the "wind project") and "other energy from CPP's supply portfolio." The power was to be delivered through power line extensions built by CPP. The parties have spent a considerable amount of time in their briefs discussing the Brooklyn solar project. However, other than to the extent it is one of several sources of electricity purchased by the city, the Brooklyn solar project is not at issue in this case. There is no dispute that the city was authorized to provide electric service to the county-owned buildings located within its municipal boundaries and to construct power line extensions to distribute power from the solar plant to those buildings in Cleveland. At issue in this case is the extent to which the city was authorized to resell electricity outside its municipal boundaries.

service is initially provided" at the rates specified in CPP's "capacity enhancement incentive rate schedule," i.e., the rate schedule "applicable to all new commercial customers who have not received Cleveland Public Power service at their present location in the preceding two years, who enter into a written 10-year contract for service anticipated to commence in 2010, who will be served by distribution capacity created as part of Cleveland Public Power's 'Capacity Enhancement Program,' and whose peak demand is equal to or in excess of 150 kilowatts." The agreement stated that it could be extended for an additional five years. The rate in effect during the five-year renewal period would be "the amount Consumer would have paid each year under the then-current standard tariff of the Cleveland Electric Illuminating Company" less "discounts" ranging from one percent to five percent. Under the terms of the agreement, CPP was to be Brooklyn's exclusive supplier, i.e., Brooklyn agreed that it would "not contract with any other electric utility for electric service to be supplied during the term of [the] [a]greement." Brooklyn further agreed that if it were to discontinue its service with the city in violation of the agreement, it would be "liable to repay CPP the savings that resulted from the discount," i.e., "the difference between the amount [Brooklyn] would have paid under the applicable CEI standard tariff and the amount [Brooklyn] paid under [the] Agreement," as well as installation costs and all damages sustained by the city. CPP thereafter began constructing distribution lines through Brooklyn to connect to CPP's lines in Cleveland.

{¶ 7} On May 9, 2018, CEI filed a complaint for a temporary restraining order and preliminary injunction, asserting claims of trespass, negligence/negligence per se and public and private nuisance against the city arising out of CPP's construction of distribution lines to service customers in Brooklyn. CEI alleged that CPP, without notice to CEI, had "begun affixing equipment to CEI's active power lines and placing CPP's new wires on top of — and in physical contact with — CEI's existing energized conductor lines." CEI claimed that this presented an "immediate risk of injury or death" as well as the potential for power losses to customers. CEI requested an injunction "preventing further work by CPP for a reasonable time to ensure that CPP adequately informs and involves CEI in the project to ensure that CPP performs the project safely and avoids injury to persons and damage to CEI's property." On May 15, 2018, the parties reached a settlement relating to CEI's request for a temporary restraining order.

{¶ 8} On July 2, 2018, CEI filed an amended complaint, asserting claims for declaratory judgment, tortious inference with contract/business relations and unfair competition against Cleveland and CPP. CEI alleged that CPP, through its purchases of electricity from the Brooklyn solar project and other sources, was "purchasing an 'artificial surplus' of electricity for resale outside its municipal territory at rates that undercut the statutory minimum rates for utilities regulated by [PUCO]" in violation of Sections 4 and 6 of Article XVIII of the Ohio Constitution. CEI further alleged that, by entering into an agreement with Brooklyn for the provision of electricity to Brooklyn municipal buildings to which CEI "had long

provided electricity," CPP had intentionally interfered in CEI's existing contracts and business relations without the privilege or legal right to do so and that CPP's "extraterritorial expansion" constituted unfair competition with CEI. CEI requested that the trial court (1) declare that "CPP's sale of electricity to Brooklyn, the inhabitants of Brooklyn, and all other extraterritorial sales derived from its artificial surpluses are unconstitutional" and that "CPP is not entitled to resell electricity extraterritorially to Brooklyn, the residents of Brooklyn, and all other customers located outside of Cleveland's municipal limits" and (2) grant CEI preliminary and permanent injunctive relief (a) enjoining CPP from "all extraterritorial sales of electricity that derive from artificial surpluses," (b) enjoining CPP's construction of the distribution lines in Brooklyn and "all other extraterritorial facilities, the purpose of which is to serve customers outside Cleveland's municipal limits" and (c) enjoining CPP from performing its agreement with Brooklyn.

{¶ 9} The city filed an answer, denying that its actions violated the Ohio Constitution or any law and asserting various affirmative defenses. Cleveland also filed a counterclaim against CEI, asserting three claims for declaratory judgment and a claim for unfair competition — malicious litigation and retaliation. The city asserted that its actions in providing electricity to county-owned buildings in Cleveland, providing electricity to Brooklyn subject to the 50 percent limitation and constructing the electric lines necessary to provide electric service to Brooklyn and the county-owned buildings in Cleveland were authorized under the Ohio Constitution and various statutory provisions. The city further alleged that (1) its

electric utility rates, set by city ordinances and approved by the legislature, were not subject to judicial review and could not constitute unfair competition and (2) CEI had engaged in "unfair commercial practices" by filing a "baseless" first amended complaint and using discovery in the litigation to access its "trade secret and competitively sensitive information." The city sought declarations in its favor on each of these issues. The city also sought a declaration that CEI had violated R.C. 4928.69 and 4928.37 by charging or threatening to charge "transition fees" or "switch fees" to customers who chose to receive their electric service from CPP and sought preliminary and permanent injunctive prohibiting CEI from interfering with the city's contractual relationships and from charging customers unreasonable "transition fees" or "switch fees" in violation of R.C. 4928.69 and 4928.37.

{¶ 10} CEI filed a motion to dismiss Cleveland's counterclaim for unfair competition (Count III of its counterclaim) and its counterclaims for declaratory judgment involving the city's electric utility rates and CEI's alleged practice of charging "transition fees" or "switch fees" (Counts II and IV of its counterclaim).

{¶ 11} After CEI amended its complaint, the trial court allowed Brooklyn, Cuyahoga County and several other parties to intervene in the action as defendants. Each of these entities also asserted counterclaims against CEI. Brooklyn and Cuyahoga County asserted a counterclaim for declaratory judgment against CEI, seeking declarations that (1) CPP is authorized to provide electricity service to county-owned buildings in Cleveland including electricity acquired from the solar project, (2) CPP is authorized to provide electricity service to Brooklyn from its

surplus product, (3) CPP is authorized to provide electric lines necessary to provide electric utility service to Brooklyn and the county-owned buildings in Cleveland and (4) the city's electric service agreements with Cuyahoga County and Brooklyn were "valid, enforceable, and within the [city's] lawful authority * * * pursuant to the Constitution and laws of the State of Ohio." Brooklyn and Cuyahoga County also sought preliminary and permanent injunctive relief "barring CEI from any further interference" in these contractual relationships. The counterclaims asserted by the other intervening defendants against CEI were later voluntarily dismissed.

{¶ 12} The city and CEI filed cross-motions for summary judgment. In its motion for summary judgment, the city argued that it was entitled to summary judgment on all CEI's claims because (1) it had acted "in accordance with the express and unambiguous language" of Sections 4 and 6, (2) it had the right to sell electricity to Cuyahoga County for its county-owned buildings in Cleveland and to customers outside its municipal boundaries subject only to the 50 percent limitation and (3) it was undisputed that the city's extraterritorial electricity sales had not exceeded the 50 percent limitation. The city further argued that it had the statutory right under R.C. 743.12, 743.13 and 743.18 to construct electric lines and to supply electric service to customers located both inside and outside its municipal boundaries.

{¶ 13} CEI opposed the city's motion and filed its own motion for summary judgment on its declaratory judgment claim. CEI argued that, based on the Ohio Supreme Court's interpretation of Sections 4 and 6 in *Toledo Edison,* 90 Ohio St.3d at 288, 737 N.E.2d 529, the city was prohibited from purchasing electricity "solely

to create an artificial surplus" for the purpose of selling electricity to an entity outside its municipal boundaries and that a genuine issue of material fact existed — based on evidence that the city was intentionally purchasing more electricity than it needed for its inhabitants in order to resell it to Brooklyn — as to whether CPP's sales of electricity to customers outside Cleveland were "drawn from * * * an 'artificial surplus.'"

{¶ 14} CEI requested that the trial court deny the city's motion for summary judgment and issue a declaration that:

> CPP may not sell electricity outside Cleveland's municipal limits unless one of the following conditions is met: (1) the electricity to be sold extraterritorially is produced by generation facilities owned and operated by CPP, and none of CPP's customers within the City of Cleveland is being served with power purchased from a separate entity; or (2) the electricity to be sold extraterritorially derives from an unavoidable surplus left over from a transaction necessary to supply customer needs within the City of Cleveland.

CEI asserted that "[o]nce the factual record is developed at trial, this declaratory judgment will guide the parties and the Court in crafting an injunction to stop CPP's violation of the Constitution."

{¶ 15} In January 2019, the trial court granted CEI's motion to dismiss Cleveland's counterclaim for declaratory judgment based on CEI's alleged violations of R.C. 4928.69 and 4928.37 (Count IV of Cleveland's counterclaim), concluding that it "patently and unambiguously lack[ed] jurisdiction" over the counterclaim because it involved a matter over which PUCO has "exclusive jurisdiction." The trial court denied CEI's motion to dismiss as to Cleveland's counterclaim for declaratory

judgment based on the city's electric utility rates (Count II of Cleveland's counterclaim) and its counterclaim for unfair competition (Count III of Cleveland's counterclaim).

{¶ 16} On May 10, 2019, the trial court issued its decision on the parties' cross-motions for summary judgment.[2] The trial court granted the city's motion for summary judgment on CEI's claims and denied CEI's motion for summary judgment on its declaratory judgment claim. The trial court further stated that "the Plaintiff's claims and the Defendants' counterclaims are found not to be well taken and are denied."

{¶ 17} The trial court interpreted Sections 4 and 6 of Article XVIII of the Ohio Constitution and *Toledo Edison, supra*, as precluding the city "only [from] purchasing electricity <u>solely</u> for the purpose of reselling the entire amount to outside customers" or from selling "surplus electricity" outside the city's geographic boundaries in excess of the 50 percent limitation. (Emphasis sic.) Because it found that there was no genuine issue of material fact that the city had not violated either of these prohibitions, the trial court granted summary judgment in favor of the city on CEI's claims. The trial court explained:

> As to the two dispositive facts the city submitted in the city's MSJ —
> that the city sells surplus electricity to customers outside of municipal
> limits at approximately 3%, well below the 50% limitation set by the
> Constitution, and that the city does not purchase electricity "solely for
> the purpose of reselling the entire amount of the purchased electricity

---

[2] The May 10, 2019 judgment entry states that it is a "nunc pro tunc entry as of & for 04/12/2019." It is unclear from the record why the trial court designated its May 10, 2019 judgment entry as a "nunc pro tunc entry." No orders were entered on April 12, 2019.

to an entity outside the municipality's geographic limits" — CEI does not offer any evidence to contradict the city. The Court's summary judgment determination should be driven exclusively by the law on the two relevant issues in this case:

(1) whether Defendants have exceeded the fifty-percent (50%) limitation set by Article XVIII, Section 6, of the Ohio Constitution in selling or agreeing to sell service or products to the city of Brooklyn and/or other entities outside the municipal boundaries and

(2) whether Defendants have purchased "electricity <u>solely</u> for the purpose of reselling the entire amount of the purchased electricity to an entity outside the municipality's geographic limits," *see Toledo Edison*, 90 Ohio St.3d at 292 (emphasis added), in selling or agreeing to sell electric service to the city of Brooklyn and/or other entities.

The city has met its burden of identifying evidence for each of these questions. In response, CEI has failed to "set forth specific facts showing that there is a genuine issue for trial" on this dispositive issue. *See Dresher* [*v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996).]

In this case, the Court specifically finds that the amount of electricity to be generated by this project and utilized outside of the city of Cleveland does not exceed the 50% limitation imposed by the Ohio Constitution. With those findings it is abundantly clear that the Plaintiff has failed to establish the existence of a genuine issue of material fact in support of its claims.

{¶ 18} Based on its ruling on CEI's unfair competition claim, the trial court determined that Cleveland's "responsive" second counterclaim for declaratory judgment relating to the city's electric utility rates was "moot as a matter of law." The trial court also entered summary judgment against Cleveland on its counterclaim for unfair competition, finding that there was no genuine issue of material fact that CEI's action was "not objectively baseless," and, consistent with its prior ruling on CEI's motion to dismiss, held that it lacked jurisdiction to consider

Cleveland's fourth counterclaim (its counterclaim for declaratory judgment based on CEI's alleged imposition of unreasonable "transition fees" or "switch fees"). Finally, "[i]n view of [its] ruling on [CEI's], claims," the trial court "likewise grant[ed] summary judgment in favor of the intervening defendants on their counterclaim for declaratory judgment."[3]

{¶ 19} CEI appealed, raising the following two assignments of error for review:

> Assignment of Error No. 1: The Common Pleas Court erred as a matter of law by failing to grant summary judgment to CEI on its declaratory-relief claim, because reasonable minds could conclude only that CPP sells electricity outside Cleveland that it has bought for that purpose.

> Assignment of Error No. 2: In the alternative, the Common Pleas Court erred by granting summary judgment to CPP on CEI's claims for declaratory relief, tortious inference, and unfair competition because the record does not show that all CPP's electricity purchases were intended to supply customers within the city of Cleveland.

**Law and Analysis**

**Standard of Review**

{¶ 20} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and conduct

---

[3] Although no party moved for summary judgment on Cleveland's counterclaims for declaratory judgment and unfair competition or Brooklyn and Cuyahoga County's counterclaim for declaratory judgment, the trial court, in its May 10, 2019 judgment entry, "resolve[d] all pending claims and counterclaims." CEI has not separately challenged, and the parties have not otherwise discussed, the trial court's rulings on the counterclaims in their appellate briefs. Accordingly, we do not further address them here other than to the extent that they are intertwined with the trial court's rulings on CEI's claims.

an independent review of the record to determine whether summary judgment is appropriate.

{¶ 21} Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.

{¶ 22} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293. Summary judgment is appropriate if the nonmoving party fails to meet this burden. *Id.*

{¶ 23} Resolution of this case turns on the interpretation and application of Sections 4 and 6 of Article XVIII of the Ohio Constitution and the Ohio Supreme Court's decision in *Toledo Edison*.

{¶ 24} CEI argues that the trial court erred in granting the city's motion for summary judgment and denying its own motion for summary judgment on its declaratory judgment claim because (1) the Ohio Constitution "forbids"

municipalities from selling electricity out of an "artificial surplus," i.e., purposefully purchasing more electricity than the city needs for its inhabitants in order to "resell" electricity to customers located outside the city's municipal boundaries, and (2) the record did not show that "all of [CPP's] electricity purchases" were intended to supply customers within its municipal boundaries, i.e., that reasonable minds could conclude that CPP purchased "some electricity" for the sole purpose of selling it to customers outside Cleveland in violation of Sections 4 and 6. The city responds that the trial court properly granted its motion for summary judgment and denied CEI's motion for summary judgment because (1) the city has a constitutional right to sell its surplus electricity to customers outside its municipal boundaries subject only to the fifty percent limitation, (2) there was no dispute that the city's extraterritorial electricity sales did not exceed the fifty percent limitation and (3) the city presented uncontroverted evidence that "[t]he City does not purchase electricity solely for the purpose of reselling *the entire amount* of that purchased electricity to an entity outside the City's geographical limits." (Emphasis added.)

{¶ 25} Section 4 authorizes a municipality to establish, maintain and operate a power plant to produce electricity and to contract with others to purchase electricity to be supplied to its inhabitants. The section states, in relevant part:

> Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service.

{¶ 26} "A municipality's authority to produce or purchase electricity is limited 'primarily to the furnishing of services to their own inhabitants.'" *Toledo Edison*, 90 Ohio St.3d at 291-292, 737 N.E.2d 529, quoting *State ex rel. Wilson v. Hance*, 169 Ohio St. 457, 461, 159 N.E.2d 741 (1959). However, Section 6 authorizes a municipality that owns or operates an electric utility to sell "surplus" electricity to customers outside its municipal boundaries under certain circumstances. That section states:

> Any municipality, owning or operating a public utility for the purpose of supplying the service or product thereof to the municipality or its inhabitants, may also sell and deliver to others any transportation service of such utility and the surplus product of any other utility in an amount not exceeding in either case fifty per cent of the total service or product supplied by such utility within the municipality * * *.

{¶ 27} In *Toledo Edison*, the Ohio Supreme Court interpreted these provisions in determining "whether a municipality has constitutional authority to purchase electricity solely for direct resale to an entity that is not an inhabitant of the municipality and not within the municipality's limits." 90 Ohio St.3d at 291, 737 N.E.2d 529. In that case, four municipalities that owned and operated their own electrical utilities entered into a joint venture to facilitate the purchase, transmission and resale of electricity. *Id.* at 288. The municipalities constructed an electric power transmission line from one of the municipalities' electrical substations directly to a smelting business located outside the municipalities' geographic limits. *Id.* at 289. The smelting business, which had been a long-term electricity customer of Toledo Edison, terminated its relationship with Toledo Edison and began purchasing

electricity from the municipalities. *Id.* The municipalities had to purchase electricity in order to fulfill their obligation to provide electricity to the smelting business. *Id.*

{¶ 28} Toledo Edison filed a complaint for injunctive and declaratory relief against the municipalities, alleging that the municipalities' purchase of electricity solely for the purpose of reselling it to the smelting business, a "noninhabitant" of the municipalities, violated Section 4. *Id.* Toledo Edison further alleged that the municipalities' sale of electricity to the smelting business violated Section 6 because the electricity sold to the smelting business was not "surplus" electricity generated by any of the municipalities' utilities but was electricity purchased by the municipalities specifically for resale to an entity outside the municipalities' geographic boundaries. *Id.* The trial court granted the municipalities' motion to dismiss for lack of standing and held that, even if Toledo Edison had standing, its claims were meritless. *Id.* at 289-290. Toledo Edison appealed.

{¶ 29} The court of appeals reversed the trial court on the standing issue. With respect to the constitutional issue, the court of appeals held that a municipality has the right under Section 6 to sell surplus electricity "without regard to whether the municipality bought the electricity for the purpose of resale" so long as the amount sold outside the municipality did not exceed fifty percent of the total electricity consumed in the municipality. *Id.* at 290. The court of appeals remanded the case for further proceedings based on Toledo Edison's claim that the

municipalities' sale of electricity to the smelting plant exceeded the fifty percent limitation. *Id.*

**{¶ 30}** The Ohio Supreme Court allowed a discretionary appeal and reversed the court of appeals. *Id.* at 290, 293. In its decision, the Ohio Supreme Court focused on the drafters' use of the term "*surplus* product" and concluded that Sections 4 and 6 "preclude a municipality from purchasing electricity solely for the purpose of reselling it to an entity that is not within the municipality's geographic limits":

> Section 6 allows a municipality that owns or operates a utility for the purpose of generating its own electricity to sell surplus electricity. Critical to our analysis of Section 6 is the meaning of the word "surplus." Language used in the Constitution should be given its usual and ordinary meaning. *Cleveland Tel. Co. v. Cleveland* (1918), 98 Ohio St. 358, 368, 121 N.E. 701, 704. "Surplus" is defined as "the amount that remains when use or need is satisfied." *Webster's Third New International Dictionary* 2301 (1993). Thus, a municipality may sell electricity that is in excess of what the municipality or its inhabitants use subject to any other limitations * * *.

> Section 4 intends to limit a municipality's authority to produce or acquire electricity primarily for the purpose of serving it or its inhabitants' needs. *Hance*, 169 Ohio St. at 461, 159 N.E.2d at 744. Section 6 intends to limit a municipality's ability to sell only that electricity that is in excess of what is needed by the municipality or its inhabitants. Read *in pari materia*, Sections 4 and 6 only allow a municipality to purchase electricity primarily for the purpose of supplying its residents and reselling only surplus electricity from that purchase to entities outside the municipality. This interpretation necessarily precludes a municipality from purchasing electricity solely for the purpose of reselling the entire amount of the purchased electricity to an entity outside the municipality's geographic limits.

> This holding comports with this court's determination that the framers "intended to * * * prevent * * * municipalities from entering into the general public-utility business outside their boundaries in competition with private enterprise." *Hance*, 169 Ohio St. at 461, 159

N.E.2d at 744. * * * To allow municipalities the unfettered authority to purchase and then resell electricity to entities outside their boundaries could create unfair competition for the heavily regulated public utilities.

Thus, we hold that Sections 4 and 6 of Article XVIII of the Ohio Constitution, read *in pari materia*, preclude a municipality from purchasing electricity solely for the purpose of reselling it to an entity that is not within the municipality's geographic limits. In other words, a municipality is prohibited from in effect engaging in the business of brokering electricity to entities outside the municipality in direct competition with public utilities. This prohibition includes a de facto brokering of electricity, i.e., where a municipality purchases electricity solely to create an artificial surplus for the purpose of selling the electricity to an entity not within the municipality's geographic boundaries.

(Emphasis added.) *Id.* at 292-293.

{¶ 31} The Ohio Supreme Court reversed and remanded the case to the trial court for a factual determination "as to whether the electricity purchased by the municipalities herein was solely for the purpose of resale to an entity outside the geographic boundaries of the municipalities." *Id.* at 293.

{¶ 32} The city contends that its practice of selling electricity outside its municipal boundaries does not violate Section 6, as interpreted in *Toledo Edison,* because (1) there is no genuine issue of fact that its extraterritorial electricity sales did not exceed the 50 percent limitation and (2) it presented uncontroverted evidence that "[t]he City does not purchase electricity solely for the purpose of reselling *the entire amount* of that purchased electricity to an entity outside of the City's geographical limits." (Emphasis added.) The city's arguments are unavailing.

{¶ 33} In *Toledo Edison,* the Ohio Supreme Court expressly rejected the proposition that the only limitation on a municipality's right to resell electricity

outside its boundaries was the fifty percent limitation, reversing the court of appeals' holding that municipalities had the right under Section 6 to sell surplus electricity regardless of whether the municipality bought the electricity for the purpose of reselling it so long as the amount sold outside the municipality did not exceed the fifty percent limitation. *Toledo Edison* at 290. As the court observed in *Toledo Edison*, Section 6 does not simply authorize a municipality to sell "product" outside its municipal boundaries up to the fifty percent limitation; it authorizes municipalities to sell a certain amount of "surplus" product. In other words, the court recognized that there were two constraints on municipalities' extraterritorial sales under Section 6. First, a municipality can sell only "surplus" product. Second, extraterritorial sales of that surplus product must not exceed the fifty percent limitation.

{¶ 34} Further, contrary to the city's assertion, the Ohio Supreme Court did not interpret Sections 4 and 6 as precluding a municipality from purchasing electricity solely for the purpose of extraterritorial resale only where it resells "the entire amount" of that purchased electricity to customers outside its geographic boundaries. Although the court stated that its interpretation of these sections "*necessarily* precludes a municipality from purchasing electricity solely for the purpose of reselling *the entire amount* of the purchased electricity to an entity outside the municipality's geographic limits," (emphasis added), the court was clear that the creation of any "artificial surplus" of electricity for resale outside a municipality's geographic limits, i.e., any purchase of electricity by a municipality

"solely for the purpose of reselling it" outside its geographic boundaries, was prohibited under Sections 4 and 6. *See id.* at 292 ("Read *in pari materia*, Sections 4 and 6 only allow a municipality to purchase electricity primarily for the purpose of supplying its residents and reselling only surplus electricity from that purchase to entities outside the municipality."); *id.* at 293 ("Sections 4 and 6 of Article XVIII of the Ohio Constitution, read *in pari materia*, preclude a municipality from purchasing electricity solely for the purpose of reselling it to an entity that is not within the municipality's geographic limits."); *id.* (remanding for a determination "as to whether the electricity purchased by the municipalities herein was solely for the purpose of resale to an entity outside the geographic boundaries of the municipalities").

{¶ 35} Accordingly, based on the Ohio Supreme Court's interpretation of Sections 4 and 6 in *Toledo Edison*, a municipality violates the Ohio Constitution if it purposely purchases more electricity than it needs for its inhabitants "solely" so that it can resell electricity to customers outside its municipal boundaries — i.e., thereby creating an artificial surplus for resale outside its geographic limits — regardless of whether (1) the municipality's extraterritorial sales exceed the fifty percent limitation or (2) the municipality purchased excess electricity in order to resell "the entire amount" of the purchased electricity outside its municipal boundaries. The trial court erred in ruling otherwise.

{¶ 36} This is not to say that a municipality is required to procure the exact amount of electricity needed by its inhabitants — and only the exact amount of

electricity needed by its inhabitants — at any given time. Consistent with the Ohio Constitution, a municipality may acquire a surplus of electricity for reasons other than "solely for the purpose of reselling" surplus electricity outside its municipal boundaries and, if it does so, the municipality may then resell the surplus to others outside its municipal boundaries subject to the 50 percent limitation. It is only where a municipality purchases more electricity than it needs for its inhabitants "*solely* for the purpose of reselling it to an entity that is not within the municipality's geographic limits," that the municipality violates Sections 4 and 6 as interpreted by the court in *Toledo Edison*. (Emphasis added.) *Toledo Edison* at 293. Accordingly, whether the city in this case violated the Ohio Constitution by reselling electricity to Brooklyn or other customers outside its municipal boundaries hinges on the purpose for which the electricity was purchased, i.e., whether it was purchased "solely for the purpose of reselling it to an entity that is not within the municipality's geographic limits," or whether it was purchased in whole or in part for some other purpose.

{¶ 37} CEI asserts that in today's energy market it is virtually impossible for a city to have "surplus" electricity within the meaning of Section 6. It contends that due to "flexible contractual arrangements" and the operation of the wholesale markets, the city (1) has the ability to tailor its electricity purchases to match actual demand to avoid purchasing excess electricity at any time and (2) can relinquish its claim to contracted electricity or resell excess electricity through the wholesale markets if it is not needed. The city disputes this claim. It asserts that it is required

to maintain an energy reserve margin that exceeds its customers' anticipated usage and states that it relies on multiple power sources, rather than just wholesale market transactions, to procure energy for its customers in order to have a "risk-mitigated, environmentally rational, and economical power supply that serves as a hedge against the volatility of the [wholesale] markets."

{¶ 38} Based on the record before us, we find that the trial court erred in granting summary judgment in favor of the city on CEI's claims. CEI presented evidence from which a reasonable factfinder could conclude that the city purchases at least some electricity solely for the purpose of reselling it to others outside its municipal boundaries. It is undisputed that the city has entered into a ten-year agreement with Brooklyn to serve as its exclusive electricity supplier. Assuming the city was complying with its contractual obligations to Brooklyn, since the city currently generates very little power of its own, arguably the only way the city could ensure that it had a sufficient supply of electricity to fulfill its contractual obligations to Brooklyn was if it intentionally purchased some electricity solely for the purpose of reselling it to Brooklyn.

{¶ 39} However, we do not agree with CEI's assertion that any surplus electricity CPP possesses can only be an "artificial surplus," i.e., "an amount acquired only so it could be resold outside Cleveland's boundaries." As stated above, we do not read the Ohio Constitution and *Toledo Edison* as requiring a municipality to produce or purchase the precise amount — and only the precise amount — of electricity needed to satisfy the requirements of its municipal customers. What

Sections 4 and 6 aim to avoid is "unfettered authority" by municipalities "to purchase and resell electricity to entities outside their boundaries" so as to "create unfair competition for the heavily regulated public utilities." *Toledo Edison* at 293. A city is not required to forgo considerations such as cost, risk mitigation, economies of scale, environmental impact and reliability in favor of purchasing only the precise amount of electricity required for use by customers within the municipality at any given time.

{¶ 40} We likewise do not agree with CEI's assertion that the trial court erred in failing to issue a declaration that:

> CPP may not sell electricity outside Cleveland's municipal limits unless one of the following conditions is met: (1) the electricity to be sold extraterritorially is produced by generation facilities owned and operated by CPP, and none of CPP's customers within the City of Cleveland is being served with power purchased from a separate entity; or (2) the electricity to be sold extraterritorially derives from an unavoidable surplus left over from a transaction necessary to supply customer needs within the City of Cleveland.

{¶ 41} The declaration CEI contends the trial court should have entered does not comport with *Toledo Edison.* As stated above, it is only where a city purchases excess electricity *solely* for the purpose of selling it outside city limits or otherwise exceeds the 50 percent limitation that the city violates the Ohio Constitution. Based on the record before us, whether the city purchased excess electricity *solely* for the

purpose of selling it to others outside municipal limits is a matter to be resolved by the trier of fact. [4]

{¶ 42} We overrule CEI's first assignment of error and sustain its second assignment of error. We reverse the trial court's decision granting summary judgment in favor of the city on CEI's claims and remand for further proceedings.

{¶ 43} Judgment reversed; remanded.

It is ordered that appellant recover from appellees the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

EILEEN T. GALLAGHER, P.J., and
ANITA LASTER MAYS, J., CONCUR

---

[4] As stated above, the 50 percent limitation is not at issue in this case. There is no dispute that the city's extraterritorial sales of electricity do not exceed the 50 percent limitation.