**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as**
*Cleveland Elec. Illum. Co. v. Cleveland*, **Slip Opinion No. 2021-Ohio-4463.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-4463

THE CLEVELAND ELECTRIC ILLUMINATING CO., APPELLANT AND CROSS-APPELLEE, *v.* THE CITY OF CLEVELAND ET AL., APPELLEES AND CROSS-APPELLANTS.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Cleveland Elec. Illum. Co. v. Cleveland*, Slip Opinion No. 2021-Ohio-4463.]**

*Ohio Constitution, Article XVIII, Sections 4 and 6—Municipal utilities—Surplus product—Summary judgment—Court of appeals' judgment reversing trial court's grant of summary judgment in favor of municipality affirmed.*

(No. 2020-0277—Submitted April 27, 2021—Decided December 21, 2021.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 108560, 2020-Ohio-33.

_____

STEWART, J., announcing the judgment of the court.

{¶ 1} Article XVIII, Section 6 of the Ohio Constitution allows a municipality that operates a public utility for the purpose of supplying the utility's

product to the municipality or its inhabitants to generate or purchase electricity and sell outside the municipality's boundaries up to 50 percent of the "surplus product." The Ohio Constitution, however, "necessarily precludes a municipality from purchasing electricity solely for the purpose of reselling the entire amount of the purchased electricity to an entity outside the municipality's geographic limits." *Toledo Edison Co. v. Bryan*, 90 Ohio St.3d 288, 293, 737 N.E.2d 529. In this appeal, we consider the concept of an "artificial surplus" of electricity and whether a municipality violates Article XVIII, Section 6 by selling such a surplus to customers outside the municipality's boundaries.

{¶ 2} In 2001, Ohio deregulated the electricity industry. *See Migden-Ostrander v. Pub. Util. Comm.*, 102 Ohio St.3d 451, 2004-Ohio-3924, 812 N.E.2d 955, ¶ 2. Deregulation led to the rise of wholesale markets through which electricity distributers may purchase electricity on demand based on the current power needs of its customers. *See generally In re Ohio Power Co.*, 155 Ohio St.3d 320, 2018-Ohio-4697, 121 N.E.3d 315. Appellee and cross-appellant the city of Cleveland, through its electricity-distribution company, appellee and cross-appellant Cleveland Public Power ("CPP") (collectively, "the city"), sells surplus electricity outside its boundaries in an amount representing approximately 4 percent of the electricity that the city sells inside its boundaries. Appellant and cross-appellee, the Cleveland Electric Illuminating Company ("CEI"), argues that because the city may purchase the precise of amount of electricity required to satisfy the current demands of its territorial customers, the electricity that the city sells extraterritorially as surplus is necessarily acquired solely to sell it beyond the city's boundaries, in violation of this court's decision in *Toledo Edison Co*. and the Ohio Constitution.

{¶ 3} The Eighth District Court of Appeals determined below that Article XVIII, Section 6 of the Ohio Constitution does not require a municipality to buy "the exact amount" of electricity required by its inhabitants at any given time and

that there may be other reasons justifying the purchase of electricity beyond a municipality's immediate needs. 2020-Ohio-33, ¶ 36. We agree. Neither Article XVIII, Section 6 nor this court's decision in *Toledo Edison Co.* requires a municipality to purchase the exact amount of electricity required to satisfy the current needs of its territorial customers. Although a municipal utility may not acquire surplus product for the sole purpose of selling it extraterritorially, it may acquire excess capacity for purposes other than reselling it as surplus beyond the municipality's boundaries without violating the Ohio Constitution. We also agree with the court of appeals that questions of material fact exist as to whether the city obtained surplus electricity for the sole purpose of selling it to a neighboring city. We therefore affirm the judgment of the Eighth District.

**Factual and procedural background**

{¶ 4} CEI is an investor-owned utility company regulated by the Public Utilities Commission of Ohio ("PUCO"). *See* R.C. 4905.04 ("The public utilities commission is hereby vested with the power and jurisdiction to supervise and regulate public utilities * * *"). Article XVIII, Section 4 of the Ohio Constitution and Cleveland City Charter Chapter 523 authorize the city to operate CPP. Both CEI and CPP distribute electricity and directly compete with each other to provide distribution services in Cleveland.

{¶ 5} Both CEI and CPP purchase electricity through the wholesale electricity market. PJM Interconnection, L.L.C. ("PJM"), a regional transmission organization ("RTO"), runs the wholesale electricity market in Ohio. PJM's mission is to ensure nondiscriminatory access to the electricity-transmission grid. PJM manages the generation, transmission, and distribution of electricity within its assigned area by establishing pricing at auction, with market administrators using algorithms to match the least expensive generation-supply resource with customer demand. PJM's customers may buy electricity one day in advance of its expected

use based on expected customer demand or on a real-time basis to account for differences between expected and actual customer demand.

{¶ 6} Along with wholesale electricity bought through PJM, CPP has an interest in several electricity-generation plants through its membership in American Municipal Power ("AMP"), a nonprofit wholesale-power supplier representing municipalities in Ohio and other states. Through AMP, the city has a portfolio of power-generation interests, including hydroelectric, wind, natural gas, and coal. Some of those interests require long-term purchases that CPP uses to mitigate the risk of volatility in the PJM energy markets. CPP's commitments for long-term purchases from AMP projects and generation assets will result in CPP's cost of electricity dropping dramatically when it pays off the bonds used to finance construction relating to the projects.

{¶ 7} In 2017, the city agreed to buy all the electricity generated by a solar-energy project in the city of Brooklyn. The city planned to use the electricity generated by the project to supply power to buildings owned by Cuyahoga County. The city also signed a ten-year agreement to be the exclusive electricity provider to several municipal buildings in Brooklyn.

{¶ 8} CEI filed in the Cuyahoga County Court of Common Pleas a declaratory-judgment action against the city and CPP, alleging that the city had unlawfully signed an agreement to sell electricity to Brooklyn at a rate 5 percent below CEI's statutorily mandated tariff. CEI claimed that the city extended distribution lines from the solar-energy project solely to poach CEI's customers. It alleged that the city did not need the electricity generated by the solar project to serve its own citizens, because it could satisfy its territorial demands solely with wholesale electricity purchases, so "any and all sales of electricity to Brooklyn, the inhabitants of Brooklyn, and other customers outside Cleveland's municipal boundaries will derive from an artificial surplus intentionally sustained and increased by CPP, acting as a de facto extraterritorial broker."

4

**{¶ 9}** The parties submitted cross-motions for summary judgment. The trial court determined that electricity from the solar project would be used to serve 12 Cuyahoga County properties and customers in Brooklyn. It also determined that the city had sold as surplus outside its boundaries "a very small percentage" of the total electricity that it had sold to customers within its boundaries and that the amount was "nowhere near" the 50 percent limitation for selling surplus product under Article XVIII, Section 6 of the Ohio Constitution. Finding that the electricity that the city had sold outside its boundaries did not exceed the constitutional limitation, the trial court granted the city's motion for summary judgment on that claim.

**{¶ 10}** CEI appealed the trial court's judgment to the Eighth District Court of Appeals, arguing that the trial court erred by not granting summary judgment in its favor and by granting summary judgment to the city. The Eighth District reversed the grant of summary judgment in favor of the city. Although the court of appeals agreed with CEI that the trial court erred in granting summary judgment to the city because the record did not demonstrate that all the city's electricity purchases are for the purpose of providing service to customers within the city's boundaries, the court refused to conclude that any surplus electricity CPP possesses is an artificial surplus acquired only for the purpose of selling it outside the city's boundaries. 2020-Ohio-33 at ¶ 35-39. The court determined that a municipality may, consistent with the Ohio Constitution, "acquire a surplus of electricity for reasons other than 'solely for the purpose of reselling' surplus electricity outside its municipal boundaries." *Id*. at ¶ 36, quoting *Toledo Edison Co.*, 90 Ohio St.3d at 293, 737 N.E.2d 529. But the court also concluded that CPP's ten-year agreement to supply electricity to Brooklyn suggested that "the only way [Cleveland] could ensure that it had a sufficient supply of electricity to fulfill its contractual obligations to Brooklyn was if it intentionally purchased some electricity solely for the purpose of reselling it to Brooklyn." *Id*. at ¶ 38.

{¶ 11} CEI appealed to this court, and the city cross-appealed. We accepted CEI's appeal on three propositions of law:

1. A municipal utility violates Article XVIII, Sections 4 and 6 if it sells electricity outside municipal boundaries from an artificial surplus, including any avoidable excess electricity a municipality purchases that was not to supply the city or its inhabitants.

2. A municipal utility violates Article XVIII, Sections 4 and 6 if it can buy only the amount of electricity needed within the city, but instead it buys excess electricity and sells electricity outside municipal boundaries.

3. A municipal utility violates Article XVIII, Sections 4 and 6 if it buys any amount of electricity for a purpose other than supplying that electricity to itself or its inhabitants, then sells the resulting excess to customers outside city limits.

*See* 159 Ohio St.3d 1417, 2020-Ohio-3365, 147 N.E.3d 662. We accepted the city's cross-appeal on the following proposition of law:

A municipal corporation has the right to sell electricity to extraterritorial customers so long as the amount sold to extraterritorial customers does not exceed fifty percent of the total electricity consumed within the municipal corporation's limits, and so long as the municipal corporation does not purchase electricity solely for the purposes of reselling the entire amount of that electricity extraterritorially.

*See id.*

**Analysis**

{¶ 12} Before 1912, "utilities could only be owned and operated under power specially conferred by legislative enactment." *Euclid v. Camp Wise Assn.*, 102 Ohio St. 207, 213, 131 N.E. 349 (1921). Courts generally employed the rule that "the jurisdiction of a municipality ceases at its boundaries, and, for it to exercise extraterritorial jurisdiction, its power to do so must be clearly expressed." *See Richards v. Portland*, 121 Ore. 340, 345, 255 P. 326 (1927). But when the framers amended the Ohio Constitution in 1912 to establish municipalities' home-rule powers, they intended to "remov[e] once and for all, all legitimate questions as to the authority of municipalities to undertake and carry on essential municipal activities." 2 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* 1433 (1912).

{¶ 13} Two specific provisions of the Ohio Constitution authorize municipalities to operate utilities. First, Article XVIII, Section 4 of the Ohio Constitution states: "Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service." Second, Article XVIII, Section 6 of the Ohio Constitution states:

> Any municipality, owning or operating a public utility for the purpose of supplying the service or product thereof to the municipality or its inhabitants, may also sell and deliver to others any transportation service of such utility and the surplus product of any other utility in an amount not exceeding in either case fifty per cent of the total service or product supplied by such utility within the municipality * * *.

When read in harmony, these sections "allow a municipality to purchase electricity primarily for the purpose of supplying its residents and reselling only surplus electricity from that purchase to entities outside the municipality." *Toledo Edison Co.*, 90 Ohio St.3d at 292, 737 N.E.2d 529.

{¶ 14} The question then is what does the phrase "surplus product" mean? In *Toledo Edison Co.*, we observed that the word "surplus," given its ordinary meaning, means " 'the amount that remains when use or need is satisfied.' " *Id*. at 292, quoting *Webster's Third New International Dictionary* 2301 (1993). In that case, four municipalities had joined to persuade a commercial customer of Toledo Edison's to buy electricity from them. *Id.* at 288-289. The four municipalities bought electricity on the wholesale market and sold it to the commercial customer, which was located beyond the municipalities' territorial boundaries. *Id.* at 290. We interpreted Article XVIII, Sections 4 and 6 and concluded that

a municipality is prohibited from in effect engaging in the business of brokering electricity to entities outside the municipality in direct competition with public utilities. This prohibition includes a de facto brokering of electricity, i.e., where a municipality purchases electricity solely to create an artificial surplus for the purpose of selling the electricity to an entity not within the municipality's geographic boundaries.

*Id*. at 293.

{¶ 15} CEI argues that any kilowatt of electricity that the city buys beyond the immediate needs of its territorial customers is, by definition, surplus product. Yet the framers of Article XVIII, Section 6 understood it differently. Consider that Section 6 and its 50 percent limitation on "surplus product" applies not only to traditional utilities like water and electricity, but also to transportation service.

During the debate on Section 6 during the Ohio Constitutional Convention of 1912, the following exchange took place:

> MR. KRAMER: I want to ask a question or two to find out how far municipalities will be allowed to go into business. Take Cincinnati. It has three hundred and fifty miles of street railway. Suppose Cincinnati should take over that three hundred and fifty miles of street railway and suppose they take in $2,000,000 a year. Does this section mean that the city of Cincinnati could go outside of Cincinnati with a railway to the extent of one hundred and seventy-five miles of inter-urban roads, or does it mean that Cincinnati could go outside a sufficient extent to take in $1,000,000?
>
> MR. KNIGHT: It was intended that the mileage outside of the city in the case of transportation service could not be in excess of one-half of that within the city itself. In the case of water supply it may supply outside of the city its surplus, but in no event to exceed one-half of that actually supplied to the people of the municipality, and the same way with lighting service.

(Capitalization sic.) 2 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* at 1455.

{¶ 16} The debate provided further evidence clarifying that Section 6 works "the same way with lighting service":

> Mr. HARBARGER: In lines 44 and 45 you say "in an amount not exceeding in either case fifty per centum of the total service." In the case of a municipal lighting plant do I understand

they are limited to the amount they can sell in the municipality and that much more?

      Mr. KNIGHT: That section applies to selling outside and you can only sell outside one-half as much as inside.

(Capitalization sic.)  2 *Proceedings and Debates* at 1445.

{¶ 17} The debate shows that the framers not only intended for municipalities to be allowed to purchase railways or power plants located outside their boundaries, but also that they intended to allow municipalities to sell the services or products therefrom extraterritorially.  But under CEI's rationale regarding the law relating to electricity surplus, we would also have to consider any railway established outside a municipality's territorial boundaries to be "surplus," because more railroad tracks would be unnecessary to serve people within the municipality's boundaries.  As noted above, the debate during the Constitutional Convention of 1912 refutes that contention.

{¶ 18} CEI maintains that CPP has no constitutionally authorized reason to buy or resell extra energy.  It reasons that the city may fulfill its electricity requirements solely through the wholesale market, so it never needs to have any excess electricity that it might sell as surplus.

{¶ 19} Our decision in *Toledo Edison Co.* forbids the purchase of electricity "*solely* for the purpose of reselling the *entire amount* of the purchased electricity to an entity outside the municipality's geographic limits." (Emphasis added.)  90 Ohio St.3d at 292, 737 N.E.2d 529.  And here, the Eighth District determined that "a municipality may acquire a surplus of electricity for reasons other than 'solely for the purpose of reselling' surplus electricity outside its municipal boundaries." 2020-Ohio-33 at ¶ 36, quoting *Toledo Edison Co.* at 293.

{¶ 20} CEI complains that the court of appeals failed to explain what it meant by the phrase "reasons other than 'solely for the purpose of reselling.' " *Id.*,

quoting *Toledo Edison Co.* at 293. That complaint lacks merit. The court of appeals listed "cost, risk mitigation, economies of scale, environmental impact[,] and reliability" as reasons that the city might have for purchasing surplus electricity. *Id.* at ¶ 39. We agree with the court of appeals. Prices in the RTO markets vary. Economic practicalities might cause a municipality to commit to long-term purchases of electricity in quantities beyond the current, real-time demands of its customers. We also recognize that volume purchasing contracts may be a hedge against the volatility of the spot wholesale markets. Long-term purchasing commitments can stabilize a municipality's supply and cost of electricity.

{¶ 21} The city also offers evidence showing that PJM requires the city to maintain a capacity-reserve margin. The reserve margin is determined by calculating the average of CPP's coincident-peak-capacity demand from the prior year, adjusted for losses and increased by a PJM-determined reserve factor. The surplus-reserve margin accounts for generation outages, fluctuations caused by weather conditions, and other changes in total customer demand.

{¶ 22} CEI argues that even if the city's long-term commitments and reserve-margin requirements lead to a surplus, the city may directly sell the surplus to RTO-administered markets rather than selling it extraterritorially. It thus concludes that CPP may, once connected to the Brooklyn solar project, sell that electricity directly to the PJM wholesale market rather than to Brooklyn.

{¶ 23} The city offers evidence indicating that selling surplus electricity to the wholesale market might sometimes be "a practical impossibility." And it submits that selling electricity to the wholesale market might lead to a loss for the city, because PJM pays a price for wholesale electricity that is lower than the price for which it sold that same electricity to a utility. In the brief of amici curiae Buckeye Power, Inc., and Ohio Rural Electric Cooperatives, Inc., amici curiae claim similar difficulties, arguing that municipal-utility poaching of their customers "would put cooperative members, the residents of areas abutting municipalities, at

risk of bearing stranded costs." Such "stranded costs" arise when a utility loses customers to a competitor and is left with debts for infrastructure and equipment that it might no longer need. But CPP has similar costs associated with its long-term investments in AMP generation projects, and those costs would be stranded if CPP were to be required to purchase electricity solely on the wholesale market. Amici curiae offer no compelling reason why priority should be given to minimizing the impact of their potential stranded costs over those of CPP.

{¶ 24} But more importantly, Article XVIII, Section 6 of the Ohio Constitution specifically authorizes a municipality to sell excess surplus product extraterritorially. That provision does not require a municipality to sell surplus product back to its source. And while it might be more economically advantageous for CEI if the city pays for electricity as it goes, "the courts cannot prohibit a municipality from making a profit on the operation of its electric light and power system." *Niles v. Union Ice Corp.*, 133 Ohio St. 169, 182, 12 N.E.2d 483 (1938), citing *Shirk v. Lancaster*, 313 Pa. 158, 168-169, 169 A. 557 (1933).

{¶ 25} CEI also argues that practices such as those employed by the city here lead to the type of unfair competition that was feared by the framers of the Ohio Constitution and this court in *Toledo Edison Co.* It maintains that its regulation by the PUCO puts it at a competitive disadvantage with CPP, which "cherrypicks large, energy-intensive customers outside the city." CEI also argues that because the PUCO does not regulate municipal electricity distributers like CPP, CPP's activities disrupt the competitive balance and harm the public interest.

{¶ 26} Investor-owned utilities raised the same argument against Article XVIII, Section 6 during the Ohio Constitutional Convention of 1912. The "chief assault" against municipal operation of utilities "came from spokesmen for the public-service corporations who argued that the amendment threatened to destroy their interests by failing to restrain unfair competition by municipally owned utilities." Warner, *Ohio's Constitutional Convention of 1912*, 61 Ohio History J.

11, 24 (1952), available at https://resources.ohiohistory.org/ohj/browse/displaypages.php?display[]=0061&display[]=11&display[]=31 (accessed Dec. 10, 2021) [https://perma.cc/JS9R-7FJC]. Herbert Seely Bigelow, the president of the Constitutional Convention of 1912, recalled that the issue of municipal operation of public utilities "does not tend to sanctify the memories of the Convention for those whose political views are colored by their own interest in public utility securities." Bigelow, *Fourth Ohio Constitutional Convention*, Ohio Legislative History 409, 410 (1913), available at https://www.law.csuohio.edu/sites/default/files/lawlibrary/ohioconlaw/1912delegates.pdf (accessed Dec. 10, 2021) [https://perma.cc/U9EP-5BMJ]. Facing opposition from investor-owned utilities, the framers were careful as to how they worded Article XVIII, Section 6: "Now, we took a great deal of time in getting the correct phraseology for this section. The members will recall how every word was weighed, what its effect was in relation to what we had in mind." 2 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* at 1458. This consideration led to plain language in Section 6 that permits a municipality to sell surplus product extraterritorially, provided that the amount sold does not exceed 50 percent of the amount the municipality sells within its boundaries. CEI acknowledges in its merit brief that the city's extraterritorial sales in 2017 amounted to "approximately [three percent] of CPP's total sales." The fact that such a relatively small amount of surplus product was sold by CPP extraterritorially belies CEI's claims of unfair competition.

{¶ 27} Today's wholesale electricity market operates in a way that the framers of the 1912 Constitution could not have foreseen. But the changing electricity market does not allow us to undermine the clear language of Article XVIII, Section 6. CEI's public-policy arguments are no different from the ones that were made when the people of Ohio adopted the amendments to the Ohio Constitution in 1912. It is up to the General Assembly and Ohio's voters, perhaps

through constitutional amendment, to address any issues of competitive imbalance between investor-owned utilities and municipal utilities.

{¶ 28} We now turn to the agreement at the heart of this case: the city's contract to provide Brooklyn with electricity for ten years. The court of appeals determined that "since the city currently generates very little power of its own, arguably the only way the city could ensure that it had a sufficient supply of electricity to fulfill its contractual obligations to Brooklyn was if it intentionally purchased some electricity solely for the purpose of reselling it to Brooklyn." 2020-Ohio-33 at ¶ 38.

{¶ 29} A court must grant summary judgment if, after viewing the evidence most favorably to the nonmoving party, "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made." Civ.R. 56(C).

{¶ 30} The city claims that it obtains electricity from various sources, that it must purchase some electricity that exceeds the daily needs of its territorial customers, and that it uses some of that surplus to provide electricity to Brooklyn. However, the record does not show the amount of electricity that CPP has in surplus at any given time and how much of that surplus is used to satisfy its commitment to Brooklyn. We therefore agree with the court of appeals that reasonable minds could differ on whether the city uses an "artificial surplus" to supply Brooklyn with electricity. The trial court erred by granting summary judgment in favor of the city.

### Conclusion

{¶ 31} Neither Article XVIII, Section 6 of the Ohio Constitution nor this court's decision in *Toledo Edison Co.* requires a municipality to purchase the exact of amount of electricity necessary to satisfy the current needs of its territorial customers. A municipal utility may acquire excess electricity capacity for reasons other than reselling it as surplus beyond the municipality's boundaries without violating the Ohio Constitution. A municipal utility may not, however, acquire

excess capacity for the sole purpose of reselling it outside the municipality's territorial boundaries.

{¶ 32} Because there are existing issues of material fact, we affirm the judgment of the Eighth District Court of Appeals, which reversed the trial court's grant of summary judgment in favor of the city and remanded the cause to the trial court for further proceedings.

Judgment affirmed.

O'CONNOR, C.J., concurs.

DONNELLY, J., concurs in judgment only.

DEWINE, J., concurs in judgment only in part and dissents in part, with an opinion joined by FISCHER, J.

KENNEDY, J., dissents, with an opinion.

BRUNNER, J., dissents, with an opinion.

_____

**DEWINE, J., concurring in judgment only in part and dissenting in part.**

{¶ 33} This case calls for the application of two provisions of the Ohio Constitution. The first provision authorizes a municipality to operate a public utility or to purchase products or services from another utility for the use of the municipality or its inhabitants. Ohio Constitution, Article XVIII, Section 4. The second provision permits a municipality to dispose of "surplus product" that was generated from the operation of its own utility by selling it to others outside the municipality's limits. Ohio Constitution, Article XVIII, Section 6. Neither provision allows a municipality to act as a de facto broker by purchasing utility products and then reselling them to customers outside the municipality.

{¶ 34} The plain text of these constitutional provisions dictates this result. And history, as well as our caselaw in the years following the adoption of the constitutional provisions, reinforce the conclusion that this reading is the correct one. The lead opinion and the dissents, though, have gotten sidetracked. Relying

on a decision of this court from 2000, they focus almost exclusively on the meaning of the word "surplus" in determining whether the city of Cleveland may resell electricity that it has purchased to customers outside the municipality. *See Toledo Edison Co. v. Bryan*, 90 Ohio St.3d 288, 737 N.E.2d 529 (2000). But whether electricity that is resold in a brokered arrangement could be described as "surplus" is beside the point. Under the constitutional provisions at issue, the city lacks any authority to resell electricity that *it has purchased* to those outside the municipality; it may only sell excess electricity that *it has produced*.

{¶ 35} I would therefore hold that a municipality's purchase of electricity for purposes other than to supply the municipality or its inhabitants is unconstitutional under Article XVIII, Section 4 of the Ohio Constitution. And I would hold that Article XVIII, Section 6 of the Ohio Constitution does not permit a municipality to resell electricity that it has purchased from another utility to those outside the municipality.

## I. The text of the municipal-utility amendments

{¶ 36} The lead opinion devotes relatively little of its analysis to the actual text of the constitutional provisions at issue. But that's where we need to start. And a careful reading of the text dictates the outcome of this case.

{¶ 37} Article XVIII, Section 4 of the Ohio Constitution ("Section 4") provides: "Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility *the product or service of which is or is to be supplied to the municipality or its inhabitants*, and may contract with others for *any such product or service*." (Emphasis added.) By its plain terms, Section 4 permits a municipality to purchase a product such as electricity for the purpose of supplying it to the municipality or its residents. But within this grant of authority is an inherent constraint: the municipality may not purchase electricity for purposes other than its use within the municipality's limits.

{¶ 38} This is clear from the text. Section 4 grants a municipality the authority to "contract with others" for "any such product or service." The language "any such product" refers back to the previous clause, "any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants." *Id.* In other words, a municipality has the power to establish a public utility, but there is a limitation: "the product or service" of that utility must "be supplied to the municipality or its inhabitants." *Id.* And it may contract with others for "any such product or service"—that is, a utility "product or service [that] is or is to be supplied to the municipality or its inhabitants." *Id.* Thus, both the authority to establish a utility and the authority to contract for utility services are cabined by the use requirement: the product or service in question must be supplied to the municipality or its inhabitants.

{¶ 39} Article XVIII, Section 6 of the Ohio Constitution ("Section 6") is the counterpart to Section 4. Whereas Section 4 deals with a municipality's power to establish its own public utility, Section 6 authorizes the municipality to sell the utility's excess product. Section 6 states:

> Any municipality, *owning or operating a public utility for the purpose of supplying the service or product thereof to the municipality or its inhabitants*, may *also* sell and deliver to others any transportation service of such utility and the surplus product of any other utility in an amount not exceeding in either case fifty per cent of the total service or product *supplied by such utility* within the municipality * * *.

(Emphasis added.)

{¶ 40} While Section 4 allows a municipality to operate a utility "the product or service of which" is supplied to the municipality's residents, Section 6

allows a limited amount of a surplus produced by a municipal utility to be sold outside the municipality. But nothing in section 6 authorizes a municipality to resell any product that was purchased elsewhere.

{¶ 41} This is evident from the structure of Section 6. The phrase "the surplus product of any other [i.e., nontransportation] utility" relates back to the "public utility" identified in the first part of the provision. *Id.* And such a public utility is specifically identified as "a public utility [owned or operated by the municipality] for the purpose of supplying the service or product thereof to the municipality or its inhabitants." *Id.*

{¶ 42} In short, Section 4 "grants municipalities broad powers to own and operate public utilities" and authorizes them "to contract for public utility services." Steinglass & Scarselli, *The Ohio State Constitution* 349-350 (2011). Section 6, in turn, "allows a municipality that owns or operates a utility to sell the surplus product produced by the utility as long as the surplus does not exceed 50 percent of the total product used by the municipality owning or operating the utility." *Id.* at 351. Indeed, as one authority has explained:

> It is only where a utility is acquired or operated by a municipality for the purpose of supplying services or products to its inhabitants under Section 4 that the municipality is further authorized by Section 6 to treat undisposed of services and products as 'surplus,' which may be distributed to consumers other than inhabitants of the municipality.

Vaubel, *Municipal Home Rule in Ohio: Part V*, 3 Ohio N.U.L.Rev. 1375, 1459 (1976); *see also Miller v. Orrville*, 48 Ohio App. 87, 90-91, 192 N.E. 474 (9th Dist.1934) ("Section 4 expressly authorizes a municipality to own and operate a utility outside of the municipality if the product or service thereof is to be supplied

18

to the inhabitants of such municipality; and section 6 provides that a municipality which, through its own utility, supplies the service or product to *its* inhabitants, 'may *also* sell and *deliver* to *others* * * * the surplus product,' etc." [emphasis and ellipsis in original]).

{¶ 43} The lead and dissenting opinions debate whether the practice of buying electricity for the purpose of reselling it outside the municipality fits within the meaning of "surplus" and is thus permitted under Section 6. By homing in on that word, they overlook the fact that the practice runs afoul of both Section 4 and Section 6. Section 4 authorizes the purchase of electricity only for the purpose of supplying it to the municipality or its inhabitants—not for selling it to others outside the municipality. And Section 6 does not permit a municipality to dispose of excess product that it *purchased* for the use of its inhabitants; it speaks to only the disposal of surplus product created by a municipality's own utility plant. The two provisions neither contemplate nor allow a municipality to act as a de facto broker for the sale of utility products.

{¶ 44} Quite simply, Section 4 requires that a municipality's acquisition or operation of a public utility be undertaken for the purpose of supplying the municipality or its inhabitants, and it is only when the operation of the utility creates excess product beyond the needs of the municipality or its inhabitants that the municipality is authorized by Section 6 to sell the excess to others outside the municipality.

### II. The history of the municipal-utility amendments

{¶ 45} History reinforces that the plain meaning of the text is the correct one. Before the adoption of Article XVIII in 1912, "municipalities could only exercise those powers granted to them by the General Assembly," and there was a growing call for cities to have more control over their own affairs. Steinglass & Scarselli, *The Ohio State Constitution*, at 49-50. Thus, a central feature of the Ohio Constitutional Convention of 1912 was the proposal of a municipal-home-rule

amendment. This amendment "changed the relationship between state and local governments by granting municipalities the specific constitutional power to choose their own form of government," "to exercise the powers of government over local affairs independent of the General Assembly," and "to operate and control public utilities." *Id*. at 345. Following debates, the amendment was proposed by the convention and adopted by the voters at the September 3, 1912 general election. *Id*. at 52-53.

{¶ 46} The topic of municipal ownership and operation of utilities was of particular concern to the delegates at the 1912 convention. In years prior, the legislature had granted municipalities that operated water utilities limited authority to supply water to neighboring municipalities. *See* G.C. 348, 66 Ohio Laws 207 (1869); G.C. 352, 66 Ohio Laws 208 (1869). Those provisions were later amended to apply to publicly owned electrical utilities. *See Miller*, 48 Ohio App. at 92, 192 N.E. 474. But the question of a municipality's "power to own and operate a public utility had been open to some question," Vaubel, *Municipal Home Rule in Ohio: Part V*, at 1382-1383, and prior to the adoption of Article XVIII, "the courts had held that the power to contract with public utilities was dependent upon the uncertainties of statutory grant, like other municipal authority," *id*. at 1383. Thus, "[t]he convention was to provide a means for alleviating the growing inconvenience caused [to] municipalities by their continuing need to seek authority from the state legislature to compete with private firms in the expanding field of public utility services." *Id*. Professor George Knight, one of the drafters of the provisions, explained that the amendment sought to

> make clearer or make broader the power of municipalities to control, either by leasing, constructing, or acquiring from corporations now owning or operating the public utilities within the corporation, the water supply, the lighting and heating supply and other things—

without specifying—which come within the purview of municipal public utilities, thus removing once and for all, all legitimate questions as to the authority of municipalities to undertake and carry on essential municipal activities.

2 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* 1433 (1912).

{¶ 47} Still, the discussion of the municipal-utility amendments at the 1912 convention focused on the authority of a municipality to operate public utilities for the benefit of its inhabitants and to sell the surplus product of those utilities. As George W. Harris, the chairman of the convention's committee on municipal government, explained, "Section 4 confers power to acquire through purchase, lease or construction any and all public utilities, and the power is given to condemn for public use any existing private utility." 2 *Proceedings and Debates* at 1458. He elaborated on the meaning of Section 6:

> Section 6 gives to the municipality the right to sell an amount of *its surplus product or service in any public utility* equal to fifty per cent of that supplied to the inhabitants of the municipality. .
>
> Now, we took a great deal of time in getting the correct phraseology for this section. The members will recall how every word was weighed, what its effect was in relation to what we had in mind, and it was found an absolute necessity *in order to make municipal ownership feasible*, because if you were going to stop a traction line at the city limits frequently you might as well have no traction line, but, to prevent that, the limit of fifty per cent excess product or service was determined on, which seemed very reasonable.

(Emphasis added.) *Id*. It was therefore clear to the delegates that the provision allowing the municipality to sell or deliver surplus product or services outside the municipality was necessary to make municipal ownership and operation of a utility economically viable—it was foreseeable that such a utility would produce more product than could be used by the municipality and that the municipality would, as a practical matter, need to sell that surplus product elsewhere.

{¶ 48} The notion that the surplus-sale provision is tied to a municipality's own production is reflected elsewhere in the debates. One delegate raised the question whether a municipality was permitted to acquire a railroad that had more rail line extending outside the municipality's limits than within its limits, and the following exchange occurred:

> MR. KRAMER: Where is there anything that prevents the municipality from owning an interurban line clear to Columbus?
>
> MR. KNIGHT: What would it do with it? What could it do with it?
>
> MR. KRAMER: Suppose it wanted to go into the railway service?
>
> MR. KNIGHT: What for?
>
> MR. KRAMER: As a matter of profit.
>
> MR. KNIGHT: It can not do it. It can not furnish service to anybody outside of the corporate limits in any amount exceeding fifty per cent of what it furnishes inside the limits.

(Capitalization in original.) *Id*. at 1444. Knight went on to say that the municipality "can not furnish transportation outside of its corporate limits exceeding fifty per

22

cent of what it furnishes inside.  Suppose you built a railroad clear across the state.  The municipality couldn't operate it."  *Id*. at 1445.

{¶ 49} Neither the plain language of the municipal-utility amendments nor the debate surrounding them suggest that the framers understood the provisions to authorize the resale of utility products purchased by the municipality from other suppliers.  This is consistent with broader views on municipal-utility ownership at the time.  As one contemporary treatise recognized, the authority of a municipality to provide water or light for its inhabitants does not permit the municipality "to go into the business of buying and selling water as a commodity to other municipalities." (Emphasis deleted.)  3 John F. Dillon, *Commentaries on the Law of Municipal Corporations* 2121 (5th Ed.1911).  But the treatise also recognized that

> [w]hen a city owns, maintains, and operates its own water or light plant, it is to be reasonably expected that in the prudent management of its works *some excess beyond the natural requirements* of the public will arise; that there will be some surplus which will be available for disposal over and above such as it requires for its own purposes and such as its inhabitants can claim by reason of the prior duty which it owes them.  With reference to the *surplus so arising, the city may contract with private individuals* for the private use thereof so long as it does so without affecting the supply which is required for public or *quasi*-public purposes.

(Emphasis in original.)  *Id*. at 2127.

{¶ 50} Another contemporary commentator explained that "a municipality may contract to furnish a supply from its plant, for use outside of the city, where not prohibited by statute or charter provision, and where there is sufficient water to

furnish the residents all that is necessary for their use." 4 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations*, Section 1800, at 3855 (1912). But even when such implicit authority is recognized, "a distinction is to be drawn between a municipality which has contracted for a supply of water and then contracts to furnish a part of it to another municipality, which is unauthorized, and a municipality which contracts to furnish a supply from its own plant." *Id*. at 3857-3858.

{¶ 51} In sum, at the very same time that the framers otherwise granted broad home-rule powers to municipalities, they placed explicit limitations on the power of municipalities to sell utility products and services. Municipalities were authorized to operate utilities, but they were subjected to restrictions that were designed to ensure that the utilities stayed within their proper purpose of serving the inhabitants of the municipality. The framers recognized that economies of scale, vagaries in supply and demand, and the need to plan for future growth meant that a prudent municipal utility might sometimes produce more than its residents then needed. As a consequence, the constitutional provisions allowed a municipality to sell its own excess product but imposed the 50 percent limitation to ensure that the municipal utility didn't stray too far beyond the authorized purpose of serving its own citizens. Further, the provisions allowed a municipality to make purchases necessary for it to serve its own citizens but did not permit the resale of purchased utility services.

### III. Caselaw interpreting the municipal-utility amendments

{¶ 52} At least until our decision in *Toledo Edison*, 90 Ohio St.3d 288, 737 N.E.2d 529, this court's longtime understanding of Sections 4 and 6 was in accord with the plain language of their text and the historical context in which they were adopted by Ohio voters.

### A. *Cases decided before* Toledo Edison

**{¶ 53}** Our 20th century caselaw comports with the view that Sections 4 and 6 limit the authority of a municipality to purchase and sell utility products and services. As far back as 1919, this court described Section 4 as "expressly authoriz[ing] a municipality to contract with any public utility, the product or service of which is to be supplied to the municipality or its inhabitants." *Ohio River Power Co. v. Steubenville*, 99 Ohio St. 421, 124 N.E. 246 (1919). In other words, the municipality may purchase electricity, but only for its own internal use.

**{¶ 54}** In *State ex rel. Wilson v. Hance*, 169 Ohio St. 457, 458, 159 N.E.2d 741 (1959), this court considered a contract under which a city was to lease and operate an electricity-generation plant for the purpose of providing electricity to nonresident consumers. This court noted that Section 4 authorizes municipalities to acquire public utilities for the purpose of serving their inhabitants and to contract with others for utility products or services. *Id.* at 460. But we went on to stress that "the disposition of the surplus services of such utilities are strictly limited by Section 6 of Article XVIII." *Id*. In analyzing that provision, this court reasoned:

> It is obvious from a consideration of that constitutional limitation that, although the framers of the Constitution believed that it would be advantageous for municipal corporations to have the power to provide public-utility services to their inhabitants and recognized that *such an operation could create a surplus product which could be disposed of outside the corporate limits* of the municipality, they clearly intended to limit municipalities primarily to the furnishing of services *to their own inhabitants* and to prevent such municipalities from entering into the general public-utility business outside their boundaries in competition with private enterprise.

(Emphasis added.) *Id.* at 461.

{¶ 55} In *Britt v. Columbus*, 38 Ohio St.2d 1, 5-6, 309 N.E.2d 412 (1974), this court considered whether Sections 4 and 6 granted a municipality the authority to appropriate property outside the municipality's limits for the purpose of selling its public-utility product to nonresidents. We held that it was not authorized to do so. . We recognized that Section 4 unquestionably gave the municipality eminent-domain authority outside the municipality for the purpose of establishing a public utility. *Id*. at 8, citing *Blue Ash v. Cincinnati*, 173 Ohio St. 345, 182 N.E.2d 557 (1962). But we explained that because that power was "expressly restricted to public utilities, the product[] or service[] of which is or is to be supplied to the municipality or its inhabitants, the exercise of eminent domain authority for such purpose under Section 4 is necessarily likewise limited." *Id*. at 8-9. And we went on to note our prior decisions holding that "the power to 'contract with others for any such product or service' confers authority to contract *solely for the purchase by the municipality of utility products or services for its inhabitants*." (Emphasis added.) *Id.* at 9, citing *State ex rel. Mitchell v. Council of Milan*, 133 Ohio St. 499, 14 N.E.2d 772 (1938), and *Ohio Power Co. v. Attica*, 23 Ohio St.2d 37, 261 N.E.2d 123 (1970). We therefore concluded that because the municipality sought to exercise its eminent-domain authority "for purposes other than supplying a public utility product or service to [the] municipality or its inhabitants," the municipality's actions were not authorized by Section 4. *Id.*

{¶ 56} This court in *Britt* proceeded to consider the question whether Section 6 independently granted a municipality the authority to acquire land through eminent-domain powers for the purpose of selling excess product to nonresidents. We held that Section 6 gave no such authority. We explained that the framers of the amendment had anticipated that "in the *operation* of a public utility by a municipality for its inhabitants, surplus products or services might be

created which could * * * be disposed of beyond the corporate limits of the municipality." (Emphasis added.) *Id*. at 9-10, citing *Hance*. But we observed that while the framers had explicitly addressed the power of condemnation with respect to municipal ownership of public utilities under Section 4, they had not done the same regarding the sale of surplus product under Section 6. *Id.* at 11.

{¶ 57} The above cases demonstrate this court's long-standing recognition that Section 4 authorizes a municipality to provide utility products or services to its inhabitants, either through its own operation of a public utility or by contracting with others for such products or services, and that Section 6 permits the municipality to sell to others only surplus product that has been generated by the public utility.

### B. Toledo Edison

{¶ 58} The one outlier case is *Toledo Edison*, 90 Ohio St.3d 288, 737 N.E.2d 529. In that brief, 11-paragraph opinion, we confronted the question whether "a municipality has constitutional authority to purchase electricity solely for direct resale to an entity that is not an inhabitant of the municipality and not within the municipality's limits." *Id*. at 291. The *Toledo Edison* court began by emphasizing the language in Section 4 permitting a municipality to operate a public utility " 'the product or service of which is or *is to be supplied to the municipality or its inhabitants*.' " (Emphasis in original.) *Id.*, quoting Ohio Constitution, Article XVIII, Section 4. Consistent with our prior cases, this court explained that under Section 4, "a municipality's authority to produce or purchase electricity is limited 'primarily to the furnishing of services to their own inhabitants.' " *Id*. at 291-292, quoting *Hance*, 169 Ohio St. at 461, 159 N.E.2d 741.

{¶ 59} The court then turned to the language of Section 6. In accord with our prior holdings, we recognized that "Section 6 allows a municipality that *owns or operates a utility for the purpose of generating its own electricity* to sell surplus

electricity." (Emphasis added.) *Id*. at 292. This court concluded that, read together,

> Sections 4 and 6 only allow a municipality to purchase electricity primarily for the purpose of supplying its residents and reselling only surplus electricity from that purchase to entities outside the municipality. This interpretation necessarily precludes a municipality from purchasing electricity solely for the purpose of reselling the entire amount of the purchased electricity to an entity outside the municipality's geographic limits.

*Id.*

{¶ 60} In reaching that conclusion, the *Toledo Edison* court correctly determined that the purchase of electricity authorized by Section 4 is limited to that which is to be supplied to the municipality or its inhabitants. The question in that case could have been answered on those grounds alone: Section 4 does not permit a municipality to purchase electricity for the purpose of reselling it to others outside the municipality. But instead, the court incorrectly assumed that the surplus-sale provision in Section 6 permitted the resale of excess energy that resulted from a *purchase* of electricity. In doing so, the court overlooked the textual constraints imposed by Sections 4 and 6, which limit resale to the surplus product created through the municipality's *operation* of a public utility.

{¶ 61} Like the lead opinion in this case, the *Toledo Edison* majority focused on the meaning of the word "surplus" and whether the practice of buying extra electricity that is not intended for use within the municipality amounts to creating an "artificial surplus." *See* 90 Ohio St.3d at 292-293, 737 N.E.2d 52. But the resolution of the issue in that case (and the one here) did not depend on whether

the sale stemmed from a "genuine" or "artificial" surplus. This is because the resale of electricity *purchased* by the municipality isn't authorized at all.

{¶ 62} Because Section 4 authorizes a municipality to operate an electricity plant or to purchase electricity for only the purpose of supplying electricity within the municipality, and because Section 6 sanctions only the sale of surplus product generated by the municipality's plant, the municipality has no authority to act as a de facto broker by purchasing electricity and reselling it to others outside the municipality's limits. Thus, the *Toledo Edison* court's ultimate conclusion was correct: "a municipality is prohibited from in effect engaging in the business of brokering electricity to entities outside the municipality in direct competition with public utilities." *Id.* at 293. But in suggesting that purchased products may in some situations be resold under Sections 4 and 6, the *Toledo Edison* court misread the constitutional text.

### IV. Resolution

{¶ 63} I agree with the lead opinion that the Eighth District Court of Appeals correctly concluded that the trial court erred in granting Cleveland's motion for summary judgment. So to that limited extent, I concur in the judgment. But, unlike the lead opinion, I would instruct the trial court on remand to apply the plain language of the constitutional provisions: Cleveland may not resell electricity that it has purchased.

{¶ 64} The Eighth District also affirmed the trial court's denial of a cross-motion for summary judgment filed by the Cleveland Electric Illuminating Company seeking a declaratory judgment as to the meaning of Sections 4 and 6. 2020-Ohio-33, ¶ 19, 42. I would reverse the judgment of the Eighth District on that point and instruct the trial court on remand to grant Cleveland Electric's motion and enter a declaratory judgment consistent with this opinion. Because the court does otherwise, I concur in judgment only in part and otherwise dissent.

FISCHER, J., concurs in the foregoing opinion.

_____

**KENNEDY, J., dissenting.**

{¶ 65} I dissent.  Article XVIII, Section 6 of the Ohio Constitution empowers municipalities to sell their surplus utility services and products to those outside of the municipality "in an amount not exceeding * * * fifty per cent of the total service or product supplied by such utility within the municipality."  Appellee and cross-appellant the city of Cleveland therefore has express home-rule authority to contract to sell its surplus electricity to the city of Brooklyn in the amount at issue here—approximately 4 percent of the electricity that the city supplies inside its borders.  The Ohio Constitution contains no language prohibiting municipalities from selling electricity to nonresidents from an "artificial," lead opinion at ¶ 30, or purposely created surplus of electricity, and this court may not add such language.  Rather, courts should read the words of a constitutional provision as written and apply their plain meaning.  *State ex rel. Sylvania Home Tel. Co. v. Richards*, 94 Ohio St. 287, 294, 114 N.E. 263 (1916).  For these reasons, I dissent and would reverse the judgment of the Eighth District Court of Appeals and reinstate the trial court's grant of summary judgment in favor of Cleveland.

### Constitutional Interpretation

{¶ 66} "The purpose of our written constitution is to define and limit the powers of government and secure the rights of the people."  *Cleveland v. State*, 157 Ohio St.3d 330, 2019-Ohio-3820, 136 N.E.3d 466, ¶ 16 (lead opinion).  Its language controls as written unless it is changed by the people themselves through the amendment procedures established by Article XVI of the Ohio Constitution.  The Ohio Constitution is the paramount law of this state, and we recognize that its framers chose its language carefully and deliberately, employed words in their natural sense, and intended what the words said, *see Gibbons v. Ogden*, 22 U.S. 1, 188, 6 L.Ed. 23 (1824), and *Lawnwood Med. Ctr., Inc. v. Seeger*, 990 So.2d 503, 510 (Fla.2008).

{¶ 67} Therefore, in construing the Ohio Constitution, our duty is to determine and give effect to the meaning expressed in its plain language, *State ex rel. LetOhioVote.org v. Brunner*, 123 Ohio St.3d 322, 2009-Ohio-4900, 916 N.E.2d 462, ¶ 50, and " '[w]here the meaning of a provision is clear on its face, we will not look beyond the provision in an attempt to divine what the drafters intended it to mean,' " *Toledo City School Dist. Bd. of Edn. v. State Bd. of Edn.*, 146 Ohio St.3d 356, 2016-Ohio-2806, 56 N.E.3d 950, ¶ 16, quoting *State ex rel. Maurer v. Sheward*, 71 Ohio St.3d 513, 520-521, 644 N.E.2d 369 (1994). We give undefined words in the Constitution their usual, normal, or customary meaning, *id.* at ¶ 16, and we may go beyond the text to consider other sources of meaning, such as the purpose of an amendment, the history of its adoption, or its attending circumstances, only "when the language being construed is 'obscure or of doubtful meaning,' " *State ex rel. Wallace v. Celina*, 29 Ohio St.2d 109, 112, 279 N.E.2d 866 (1972), quoting *Cleveland v. Bd. of Tax Appeals*, 153 Ohio St. 97, 103, 91 N.E.2d 480 (1950); *see also Maurer* at 522 ("we will not look to the history of a provision where * * * the language of the provision is clear").

### The Home Rule Amendment

{¶ 68} Prior to 1912, "the source and extent of municipal power was derived from the enactments of the General Assembly." *Cincinnati Bell Tel. Co. v. Cincinnati*, 81 Ohio St.3d 599, 605, 693 N.E.2d 212. "[M]unicipalities could exercise only those powers delegated by statute." *Geauga Cty. Bd. of Commrs. v. Munn Rd. Sand & Gravel*, 67 Ohio St.3d 579, 582, 621 N.E.2d 696 (1993). "Such power, being legislative only, could be withdrawn from the municipalities, or amended, at any session of the Legislature, * * * and there was neither stability of law, touching municipal power, nor sufficient elasticity of law to meet changed and changing municipal conditions." *Perrysburg v. Ridgway*, 108 Ohio St. 245, 255, 140 N.E. 595 (1923).

**{¶ 69}** The General Assembly also had the power to create, regulate, and abolish municipal utilities. *Euclid v. Camp Wise Assn.*, 102 Ohio St. 207, 210, 131 N.E. 349 (1921). "Prior to the 1912 amendment, and subsequent to 1851, utilities could only be owned and operated under power specially conferred by legislative enactment." *Id.* at 213. Under the 1851 Ohio Constitution, municipalities did not have the "inherent right" to operate utilities, and when authorized by statute, municipal utilities were subject to "restrictions and conditions relative to [the utility] without limit." *Id.* at 210.

**{¶ 70}** To remedy those problems, the people of this state adopted Ohio's Home Rule Amendment in 1912, which provides that "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Article XVIII, Section 3, Ohio Constitution. Article XVIII, Section 7 states that "[a]ny municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government."

**{¶ 71}** "[T]he intention of the Home Rule Amendment was to eliminate statutory control over municipalities by the General Assembly." *Cincinnati Bell Tel. Co.*, 81 Ohio St.3d at 605, 693 N.E.2d 212. Accordingly,

"[b]y reason of Sections 3 and 7 of Article XVIII of the Ohio Constitution, a charter city has all powers of local self-government *except to the extent that those powers are taken from it or limited by other provisions of the Constitution* or by statutory limitations on the powers of the municipality which the Constitution has authorized the General Assembly to impose."

(Emphasis added in *Westlake*.) *State ex rel. Commt. for the Charter Amendment, City Trash Collection v. Westlake*, 97 Ohio St.3d 100, 2002-Ohio-5302, 776 N.E.2d 1041, ¶ 31, quoting *Bazell v. Cincinnati*, 13 Ohio St.2d 63, 233 N.E.2d 864 (1968), paragraph one of the syllabus.

{¶ 72} And "[w]ith respect to a municipally operated public utility, the municipality's powers, rights and privileges are derived directly from the people, pursuant to the provisions of Sections 4 and 6 of Article XVIII of the Constitution, and not from the General Assembly." *State ex rel. McCann v. Defiance*, 167 Ohio St. 313, 316, 148 N.E.2d 221 (1958). Article XVIII, Section 4 states, "Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service." Article XVIII, Section 6 further provides:

> Any municipality, owning or operating a public utility for the purpose of supplying the service or product thereof to the municipality or its inhabitants, may also sell and deliver to others any transportation service of such utility and the surplus product of any other utility in an amount not exceeding in either case fifty per cent of the total service or product supplied by such utility within the municipality, provided that such fifty per cent limitation shall not apply to the sale of water or sewage services.

{¶ 73} The Home Rule Amendment, then, reversed the balance of power between the state and municipalities regarding the operation and regulation of municipal utilities. As this court explained in *McCann*, "it would appear that the General Assembly has no power to limit or restrict, by regulation or otherwise, the power and authority of a municipality to operate a public utility for the purpose of

supplying the product thereof to such municipality or its inhabitants, or selling and delivering to others some of the surplus product thereof." *Id.* at 316.

### *Toledo Edison Co. v. Bryan*

{¶ 74} In *Toledo Edison Co. v. Bryan*, this court confronted the same issue presented in this case: "whether a municipality has constitutional authority to purchase electricity solely for direct resale to an entity that is not an inhabitant of the municipality and not within the municipality's limits." 90 Ohio St.3d 288, 291, 737 N.E.2d 529 (2000). We explained that in adopting Article XVIII, Section 4, the people "intend[ed] to limit a municipality's authority to produce or acquire electricity primarily for the purpose of serving it or its inhabitants' needs," *id.* at 292, and that the people intended for Article XVIII, Section 6 "to limit a municipality's ability to sell only that electricity that is in excess of what is needed by the municipality or its inhabitants," *id.* And we read Sections 4 and 6 in pari materia to "only allow a municipality to purchase electricity primarily for the purpose of supplying its residents and reselling only surplus electricity from that purchase to entities outside the municipality." *Id*.

{¶ 75} "This interpretation," this court determined, "necessarily precludes a municipality from purchasing electricity solely for the purpose of reselling the entire amount of the purchased electricity to an entity outside the municipality's geographic limits." *Id.* "This prohibition includes a de facto brokering of electricity, i.e., where a municipality purchases electricity solely to create an artificial surplus for the purpose of selling the electricity to an entity not within the municipality's geographic boundaries." *Id.* at 293.

{¶ 76} *Toledo Edison Co.* provides the rule of decision in this case, and the doctrine of stare decisis generally requires a court to adhere to an established precedent in subsequent cases in which the same question of law is at issue. *Clark v. Snapper Power Equip., Inc.*, 21 Ohio St.3d 58, 60, 488 N.E.2d 138 (1986). But stare decisis does not compel this court to follow an incorrect interpretation of the

34

Constitution.  As we explained in *Rocky River v. State Emp. Relations Bd.*, "each judge remembers above all that she or he has sworn to support and defend the Constitution—not as someone else has interpreted it but as the judge deciding the case at bar interprets it."  43 Ohio St.3d 1, 6-7, 539 N.E.2d 103 (1989).  Because it is "beyond the power of the legislature to change or 'correct' judicial interpretation of the Constitution," *id.* at 6, "it is incumbent on the court to make the necessary changes and yield to the force of better reasoning," *id.*

{¶ 77} In my view, *Toledo Edison Co.* should be overruled.  To begin, this court erroneously construed Article XVIII, Section 6 as imposing a prohibition on reselling electricity.  However, the purpose of the Home Rule Amendment was to rebalance the allocation of power between the state and municipalities.  Article XVIII, Sections 4 and 6 represent a positive grant of power to municipalities, creating a constitutional default rule that if a municipality owns and operates a utility within the bounds of the power granted to it, it is immune from regulation enacted by the General Assembly.  *See McCann*, 167 Ohio St. at 316, 148 N.E.2d 221 (the General Assembly has "no power" to restrict municipalities' exercise of power under Article XVIII, Sections 4 and 6).  Section 6 therefore limits the *extent* of the specific home-rule power granted to municipalities to operate utilities, but it does not prohibit a municipality from acting in ways otherwise permitted by the home-rule authority conferred by Article XVIII, Section 3 or by state law.  Section 6 says what a municipality may do, not what it shall not do.

{¶ 78} Operating a municipal utility is a proprietary function that is separate from a municipality's governmental functions.  *Akron v. Pub. Util. Comm.*, 149 Ohio St. 347, 354, 78 N.E.2d 890 (1948); *see also* R.C. 2744.01(G)(2)(c) (operating a municipal utility defined as a proprietary function); *Schenkolewski v. Cleveland Metroparks Sys.*, 67 Ohio St.2d 31, 33, 36-37, 426 N.E.2d 784 (1981) (municipal corporations have both governmental and proprietary functions).  And we have recognized that "so far as a municipality acts in a proprietary capacity it possesses

the same rights and powers and is subject to the same restrictions and regulations as other like proprietors." *Akron* at 354. The state generally excludes municipal utilities from regulation, *see* R.C. 4928.01(A)(11) and 4933.81(A), and neither the court below nor the parties point to any statute prohibiting municipalities from reselling electricity to nonresidents.

{¶ 79} But more fundamentally, this court in *Toledo Edison Co.* failed to give effect to the plain meaning of the Ohio Constitution's language. According to a dictionary that was published contemporarily with the adoption of the Home Rule Amendment, the word "surplus" meant "[t]hat which remains when use or need is satisfied; excess; overplus," *Webster's New International Dictionary* 2086 (1911), and "[b]eing or constituting a surplus; more than sufficient," *id.* at 2087. The word "surplus" does not have any connotation distinguishing between its being natural or artificial, or purposeful or accidental. It simply means having more than enough. Therefore, according to the natural reading of Article XVIII, Section 6, a municipality has the express constitutional authority to sell its excess electricity to nonresidents so long as (1) the needs of its residents are satisfied first and (2) sales to nonresidents do not exceed 50 percent of the total electricity supplied within the municipality. To hold that Section 6 prohibits sales from an "artificial" or purposely created surplus, then, is to add words to the constitutional provision; however, a court may not "add to or subtract from the plain and usual meaning of [a] constitutional provision," *State v. Billotto*, 104 Ohio St. 13, 15-16, 135 N.E. 285 (1922).

{¶ 80} We are obligated to construe the words in Article XVIII, Section 6 in the way that the people who adopted the 1912 Ohio Constitution would have naturally understood them. *See Centerville v. Knab*, 162 Ohio St.3d 623, 2020-Ohio-5219, 166 N.E.3d 1167, ¶ 22. Although framed during the Ohio Constitutional Convention of 1912, the Constitution was adopted through the votes of the body of electors in this state. And as the United States Supreme Court has

36

explained, that is the reason that "[t]he simplest and most obvious interpretation of a constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption." *Lake Cty. v. Rollins*, 130 U.S. 662, 671, 9 S.Ct. 651, 32 L.Ed. 1060 (1889). It is manifest that the people in 1912 were unfamiliar with the current realities of electricity generation and distribution in this country, including deregulation, interstate wholesale markets, long- and short-term contracting, and reserve-capacity regulations. We cannot take the meaning of the word "surplus" as it is might be understood in the modern-day law of public utilities and project it onto the 1912 voters.

{¶ 81} Rather, the people who adopted Article XVIII, Section 6 understood it to mean what it said: municipalities would be permitted to sell as much as one-third of its utilities' total product to nonresidents after the needs of its residents were satisfied. Such a large surplus—one-third of the total supplied to both residents and nonresidents—could be produced only by operating the utility at a capacity greater than necessary to serve the municipality's residents, with the purpose of selling the excess to nonresidents. As one delegate to the 1912 convention explained, allowing sales to nonresidents was "an absolute necessity in order to make municipal ownership feasible." 2 *Proceedings and Debates of the Constitutional Convention of the State of Ohio* 1458 (1912). That is, a large amount of a utility's production was expected to be sold to nonresidents in order to make sales to residents cost-effective.

{¶ 82} In this case, Cleveland sells to nonresidents an amount of electricity that is approximately 4 percent of the electricity that its municipal utility supplies within the city, and there is no indication that the electricity supplied to nonresidents prevents the utility from satisfying the demand of Cleveland residents first. Article XVIII, Section 6 therefore expressly authorizes these sales. The trial court properly entered summary judgment in favor of the city, and I would reverse the contrary judgment of the court of appeals. Because this court does not, I dissent.

_____

**BRUNNER, J., dissenting.**

{¶ 83} I agree with the lead opinion that Article XVIII, Section 6 of the Ohio Constitution does not require a municipal utility to purchase only the exact amount of electricity that it needs to serve its inhabitants and that there are numerous lawful reasons why it might acquire a surplus. I disagree, however, with the judgment affirming the remand of this case to the trial court on the ground that appellee and cross-appellant, the city of Cleveland, may have violated Article XVIII, Section 6 when it agreed to provide electricity to appellee and cross-appellant, the city of Brooklyn. The lead opinion bases its determination on the rule that this court announced in *Toledo Edison Co. v. Bryan*, 90 Ohio St.3d 288, 737 N.E.2d 529 (2000). In my view, the facts here do not enable appellant and cross-appellee, the Cleveland Electric Illuminating Company ("Cleveland Electric"), to prevail on its claim under *Toledo Edison Co.*

{¶ 84} In *Toledo Edison Co.*, a public utility sued four municipalities after the municipalities formed a joint venture and began providing electricity to an industrial customer located outside their geographic limits. *Id.* at 288-289. In its complaint, the public utility identified ordinances by which the individual municipalities had authorized their respective utilities to enter into power-purchase agreements with a wholesale electricity supplier. *Id.* at 289. It also alleged that the resulting agreements were entered into for the purpose of enabling the municipalities to provide electricity to the industrial customer. *Id.* Overall, the public utility claimed, this meant that the purchase agreements violated Article XVIII, Section 4 and that the municipalities' resale to the industrial customer of the electricity purchased under those agreements violated Section 6. *Id.*

{¶ 85} When the dispute reached this court, the four municipalities acknowledged in their briefs to this court that they had entered into the agreements with the wholesale electricity supplier "[a]s part of their arrangements to supply

electricity to" the industrial customer. *Toledo Edison Co. v. Bryan*, case No. 1999-1280, *7-8 (Feb. 23, 2000). They argued, however, that these agreements did not mean that they acted as electricity brokers. *Id.* at *8. They also emphasized that some of the electricity that they provided to the industrial customer came from another source: it had been "reallocated from preexisting joint wholesale electricity purchase." *Id.*

{¶ 86} Given that background, we observed that "[t]he municipalities had to purchase electricity in order to fulfill their obligation to provide [the industrial customer] with electricity." *Toledo Edison Co.*, 90 Ohio St.3d at 289, 737 N.E.2d 529. . We then held that Sections 4 and 6 prohibit a municipality from "purchasing electricity solely for the purpose of reselling it to an entity that is not within the municipality's geographic limits." *Id.* at 293. This includes "a de facto brokering of electricity, i.e., where a municipality purchases electricity solely to create an artificial surplus" for resale outside its boundaries. *Id.* We therefore entered judgment remanding the case to the trial court for it to determine "whether the electricity purchased by the municipalities [in the agreements with the wholesale electricity supplier] was solely for the purpose of resale to an entity outside the geographic boundaries of the municipalities." *Id.*

{¶ 87} In my view, the holding of *Toledo Edison Co.* is properly understood as being limited to its facts. That is, the case announces a rule to be applied when considering specific power-purchase agreements. The dispute before this court was clearly focused on specific power-purchase agreements that the municipal utilities acknowledged were entered into for the purpose of resale to the industrial customer. This court's holding and remand order therefore provided the trial court with a concrete and manageable task: it was required to determine whether the specific agreements with the wholesale electricity supplier were entered into "solely" for the purpose of resale. If so, they were unlawful.

**{¶ 88}** The lead opinion here does not identify any fact indicating that appellee and cross-appellant, Cleveland Public Power ("CPP"), entered into any specific power-purchase agreement in order to meet its obligation to provide electricity to Brooklyn. Nor does Cleveland Electric. Instead, Cleveland Electric discusses in its briefs CPP's power-purchase contracts as a whole and argues that they enable CPP to purchase exactly the amount of electricity that it needs to serve entities within Cleveland, meaning that *any* additional electricity that CPP obtains is an unlawful artificial surplus under Article XVIII, Sections 4 and 6. I agree with the lead opinion's rejecting this argument. And because the parties have already had an opportunity to conduct discovery, no additional facts on these matters should be identified or developed on remand.

**{¶ 89}** In my view, Cleveland Electric has not met its burden on summary judgment. It has not identified any fact that would enable a reasonable juror to conclude that CPP entered into any power-purchase agreement "solely" for the purpose of reselling that power to Brooklyn. Cleveland and CPP are therefore entitled to summary judgment on Cleveland Electric's claim under Sections 4 and 6.

**{¶ 90}** For these reasons, I respectfully dissent.

———————————

Benesch, Friedlander, Coplan & Aronoff, L.L.P., Gregory J. Phillips, Michael J. Montgomery, Michael D. Meuti, James E. von der Heydt, and James J. Walsh Jr., for appellant and cross-appellee.

Carpenter, Lipps & Leland, L.L.P., Kimberly W. Bojko, Angela Paul Whitfield, and Stephen E. Dutton, for appellees and cross-appellants the city of Cleveland and Cleveland Public Power.

Bricker & Eckler, L.L.P., Drew H. Campbell, and Elyse Akhbari, for appellee and cross-appellant Cuyahoga County.

Kevin M. Butler, Brooklyn Law Director, for appellee and cross-appellant city of Brooklyn.

Thompson Hine, L.L.P., and Stephanie M. Chmiel; and Kurt Helfrich and Lija Kaleps-Clark, urging reversal for amici curiae Buckeye Power, Inc., and Ohio Rural Electric Cooperatives, Inc.

Steven T. Nourse, urging reversal for amicus curiae Ohio Power Company.

James E. McLean, urging reversal for amicus curiae Duke Energy Ohio, Inc.

Michael J. Schuler, urging reversal for amicus curiae The Dayton Power and Light Company.

Lisa G. McAlister and Gerit F. Hull, for amicus curiae American Municipal Power, Inc., in support of appellees and cross-appellants.

Lisa G. McAlister, for amicus curiae Ohio Municipal Electric Association, in support of appellees and cross-appellants.

Garry E. Hunter; and Paul W. Flowers Co., L.P.A., Paul W. Flowers, and Louis E. Grube, for amicus curiae Ohio Municipal League, in support of appellees and cross-appellants.

_____